UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

|  |  |
|---|---|
| DEPENDABLE HIGHWAY EXPRESS, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>ANHEUSER-BUSCH, LLC, a Missouri limited liability company,<br><br>Defendant. | ) ) ) ) Case No.<br>) ) COMPLAINT FOR BREACH OF<br>) CONTRACT, ACCOUNT, ACCOUNT<br>) STATED, BREACH OF THE<br>) COVENANT OF GOOD FAITH AND<br>) FAIR DEALING, AND UNJUST<br>) ENRICHMENT<br>)<br>) DEMAND FOR JURY TRIAL<br>)<br>) |

## COMPLAINT

AND NOW, comes Plaintiff, DEPENDABLE HIGHWAY EXPRESS, INC. ("Dependable"), by and through its undersigned counsel, hereby files the within Complaint for Breach of Contract, Account, Account Stated, Breach of the Covenant of Good Faith and Fair Dealing, and Unjust Enrichment against Defendant, ANHEUSER-BUSCH, LLC ("AB") (collectively the "Parties"), stating the following in support thereof.

## PARTIES

1.     Dependable Highway Express, Inc. is a California corporation with its principal place of business at 2555 E. Olympic Blvd in Los Angeles, California 90023. Dependable is a company that provides supply chain services, including transportation and warehouse services.

2.     Anheuser-Busch, LLC is a Missouri limited liability company with its principal place of business at One Busch Place in St. Louis, Missouri 63118. Per documentation provided to its vendors, AB is a beverage company that brews and imports beer products.

## JURISDICTION AND VENUE

3.     Under 28 U.S.C. Section 1332(a), this Court has subject-matter jurisdiction over all

270084961

claims at issue because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties are citizens of different states, namely, for diversity purposes, Dependable is a citizen of California as it has its principal place of business in California and AB is a citizen of Missouri as it has its principal place of business in Missouri.

4.      Venue is proper with this Court pursuant to 28 U.S.C. Section 1391(b) because AB is a citizen of Missouri and has its principal place of business in St. Louis, Missouri.

## FACTUAL ALLEGATIONS

### The Contractual Relationship Between Dependable and AB

5.      Dependable is a California corporation engaged in port drayage and linehaul trucking and in the operation of warehousing facilities near the ports of Los Angeles, Long Beach and Oakland, California.

6.      In or around March 10, 2016, Loren Foster, an agent for AB, issued a Request for Proposal of LA Imports Warehousing. A true and correct copy of the Request for Proposal is attached hereto and incorporated herein as **Exhibit "A"**. Dependable was awarded by AB certain port drayage and warehousing business in southern California.

7.      On July 1, 2016, Dependable, doing business as Dependable Companies, Inc., and AB entered into a Warehouse Service and License Agreement ("Warehouse Agreement"). A true and correct copy of the Warehouse Agreement is attached hereto and incorporated herein as **Exhibit "B"**.

8.      Dependable agreed to receive, transport, store, load and unload AB's products, supplies, and returnables in exchange for timely payment of fees and reimbursement of certain allowed costs and expenses, all as fully described in the Warehouse Agreement.

9.      Dependable agreed to provide invoices for costs and fees to AB no later than ten (10) days after the last day of each calendar month in accordance with the variable and fixed fees agreed to by the Parties in Exhibit B of the Warehouse Agreement. In turn, AB agreed to pay the full amount of the invoices from Dependable within one hundred twenty (120) days after receipt of each invoice.

270084961

10.     The Parties also agreed that interest of ten percent (10%) per annum would accrue on any undisputed portion of an invoice from the one hundred sixtieth (160th) day after the day AB received the invoice until the day AB paid the invoice to Dependable.

11.     On July 8, 2019, the Parties executed a First Amendment to Warehouse Services and License Agreement ("2019 First Amended Agreement"). A true and correct copy of the 2019 First Amended Agreement is attached hereto and incorporated herein as **Exhibit "C"**. The 2019 First Amended Agreement extended the initial term of the Warehouse Agreement for one year from July 1, 2019 through June 30, 2020. The 2019 First Amended Agreement also replaced the Exhibit B of the Warehouse Agreement with the newly agreed to variable and fixed fees by the Parties.

12.     On June 29, 2021, the Parties executed a 2021 First Amendment to Warehouse Services and License Agreement ("2021 First Amended Agreement"). A true and correct copy of the 2021 First Amended Agreement is attached hereto and incorporated herein as **Exhibit "D"**. The 2021 First Amended Agreement extended the initial term of the Warehouse Agreement for one year from July 1, 2021 through June 30, 2022. The 2021 First Amended Agreement also replaced the Exhibit B of the Warehouse Agreement with the newly agreed to variable and fixed fees by the Parties.

13.     The Warehouse Agreement, 2019 First Amended Agreement, and 2021 First Amended Agreement (collectively "Agreements") contain the terms and conditions of the agreement between Dependable and AB. The Agreements set forth the meeting of the minds and manifestation of assent of the Parties to the terms of the promise and to the consideration for it.

14.     Dependable performed all of its duties and obligations owing under the Agreements with respect to the services invoiced.

15.     Dependable timely provided invoices to AB for the fees and costs incurred by Dependable in carrying out its duties and obligations pursuant to the terms of the Agreements.

## COUNT I – BREACH OF CONTRACT

16.     The allegations in paragraphs 1 through 15 above are incorporated by reference as

270084961

though fully set forth herein.

17.     Between July 1, 2016 and January 31, 2022, Dependable performed all of its duties and obligations owing under the Agreements.

18.     Between April 3, 2020 and March 25, 2022, Dependable sent invoices and collection statements to AB for the services rendered by Dependable pursuant to the terms of the Agreements.

19.     Between April 3, 2020 and March 25, 2022, AB failed to pay Dependable for monthly fees and expenses when due pursuant to the terms of the Agreements.

20.     As of the date of the filing of this Complaint, AB has not validly disputed any issued invoice pursuant to the terms of the Agreements.

21.     On June 10, 2022, AB served a Notice of Breach to Dependable advising that AB would not perform by rendering payment for outstanding invoices for the services Dependable provided to AB in accordance with the terms of the Agreements. A true and correct copy of the Notice is attached hereto and incorporated herein as **Exhibit "E"**.

22.     As of the date of the filing of this Complaint, AB has not made full payments of the invoices issued since April 3, 2020 and has failed to specify any basis to dispute any invoice as is required pursuant to the terms of the Agreements.

23.     The Agreements are valid and enforceable contracts, supported by good and valuable consideration.

24.     AB materially breached the Agreements by failing and refusing to pay monthly fees and expenses for services rendered when due.

25.     As a direct and proximate result of AB's breach, Dependable has suffered and will continue to suffer damages exceeding $2,444,292.64.

## COUNT II – ACCOUNT

26.     The allegations in paragraphs 1 through 25 above are incorporated by reference as though fully set forth herein.

27.     AB has become indebted to Dependable for the invoices of the fees and expenses

incurred by Dependable in performing its duties and obligations pursuant to the Agreements, which total indebtedness is in an amount not yet ascertained, but is believed to be in excess of $2,444,292.64, excluding interest, future expenses, and costs and attorneys' fees, the exact amount of which is to be determined at the time of trial.

28.     The above sum has not been paid although demand was made by Dependable on various dates for the outstanding invoices since April 3, 2020. There is now due, owing and unpaid by AB to Dependable the sum of at least $2,444,292.64, as well as interest, and further expenses, costs and attorneys' fees.

29.     The losses, costs and expenses incurred by Dependable in connection with services provided to AB pursuant to the Agreements for which Dependable is seeking payment from AB are reasonable.

## COUNT III – ACCOUNT STATED

30.     The allegations in paragraphs 1 through 29 above are incorporated by reference as though fully set forth herein.

31.     Since July 1, 2016, Dependable and AB engaged in financial transactions pursuant to Agreements between Dependable and AB.

32.     The terms of the Agreements specifically outlined the costs and fees for services rendered by Dependable for monetary consideration to be paid by AB pursuant to the costs and fees schedules in the Agreements.

33.     The terms of the Agreements also specifically cover agreement between the Parties as to balances due and payment of invoices.

34.     AB, by agreeing to the terms of the Agreements, acknowledged its obligation to pay the agreed costs and fees for services rendered by Dependable.

35.     AB, by agreeing to the terms of the Agreements, expressly made an unconditional promise to pay for sums incurred, believed to be in excess of $2,444,292.64, excluding interest, future expenses, and costs and attorneys' fees, for the services rendered by Dependable in carrying out its duties and obligations as set forth in the Agreements.

## COUNT IV – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

36.     The allegations in paragraphs 1 through 35 above are incorporated by reference as though fully set forth herein.

37.     Dependable entered into the Agreements with AB in good faith to provide transportation and warehousing services in exchange for the agreed upon monetary consideration.

38.     AB has a duty to act in good faith with Dependable with regards to each party's duties and obligations pursuant to the Agreements.

39.     After Dependable provided the invoices to AB, notified AB of its failure to pay for outstanding invoices and requested payment of the outstanding sums owed to Dependable, AB had a duty to fairly deal with Dependable and the circumstances surrounding the charges incurred by AB for the services provided by Dependable.

40.     Instead, AB failed to act in good faith and to fairly deal with the Dependable.

41.     AB breached the duty of good faith and fair dealing with regards to sums due, owed, and unpaid to Dependable by failing to timely pay for the invoices pursuant to the terms of the Agreements and refusing to pay the sums owed to Dependable when AB was notified of its outstanding and unpaid invoices for the services rendered by Dependable.

42.     AB knowingly and wantonly refused to pay for outstanding sums due, owed, and unpaid to Dependable without reasonable cause to do so.

43.     Due to AB's breach of the covenant of good faith and fair dealing, Dependable suffered significant financial harm.

## COUNT V – UNJUST ENRICHMENT

44.     The allegations in paragraphs 1 through 43 above are incorporated by reference as though fully set forth herein.

45.     Dependable provided transportation and warehousing services to AB pursuant to the terms of the Agreements between the Parties.

46.     The services were rendered by Dependable with the reasonable expectation that it would be paid for the services it provided to AB as agreed to by the Parties in the Agreements.

47.     AB requested and accepted the services while knowing or reasonably should have known that Dependable expected to paid for the services provided.

48.     By failing to pay Dependable the sums owed to it, AB has become unjustly enriched and is indebted to Dependable under the theory of Quantum Meruit for a minimum of $2,444,292.64, excluding interest, future expenses, and costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Dependable demands judgment against AB as follows:

1. Damages in an amount to be proven at trial;

2. An award of interest, attorneys' fees, costs, and other expenses; and

3. Any such other relief as the Court deems just and proper.

Dated:  January 20, 2023                    CLARK HILL LLP


By:  _____
          Jason M. Schwent, Esq.
          Attorney for Plaintiff, DEPENDABLE
          HIGHWAY EXPRESS, INC.

270084961

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff, DEPENDABLE HIGHWAY EXPRESS, INC. hereby demands a trial by jury.

Dated:  January 20, 2023                    CLARK HILL LLP


By: _____

Jason M. Schwent, Esq.
Attorney for Plaintiff, DEPENDABLE
HIGHWAY EXPRESS, INC.

270084961

# Exhibit "A"



# Request for Proposal (RFP): LA Imports Warehousing

**Issued by:  Loren Foster, Procurement**

**Date Issued:  10 March 2016**

**Response Deadline:   17 March 2016 (Advise if more time needed)**

*This Request for Proposal is confidential and proprietary to*
*Anheuser-Busch Companies, LLC*

# Overview

Anheuser-Busch Companies, LLC invites proposals per the instructions in this document.  As used herein, the term "Anheuser-Busch" or "AB" shall refer to Anheuser-Busch Companies, LLC or Anheuser-Busch Companies, LLC and its subsidiaries and affiliates, as appropriate.

## Negotiations

Proposals, negotiations, discussions, demonstrations and tests may or may not be entered into or required of bidders submitting proposals, which in the sole judgment of Anheuser-Busch are worthy of continued consideration.

## Non-Disclosure

All information about Anheuser-Busch included in this Request for Proposal (RFP) and all Appendices attached hereto is proprietary information.  Anheuser-Busch requires you to keep this information confidential. It is Anheuser-Busch's express wish to keep this bid process among a few select providers. No news release, public announcements, or reference to this RFP or any phase of the project described herein, shall be made without the prior written consent of Anheuser-Busch.

## Proposal Terms, Requirements and Instructions

1. Schedule of Activities

    1.1. Following are key dates for this proposal.  Anheuser-Busch, may, at its discretion, extend these dates.

    RFP Delivered by: 10 March 2016

    Proposal Due by: 17 March 2016 (Advise if more time needed)

    Final E-Auction by: TBD

2. Proposal Submission

    2.1. Completed proposals shall be sent electronically via email to Loren Foster at loren.foster@anheuser-busch.com.

    2.2. Bidders have the sole responsibility for delivery of their proposal on or before the deadline. Proposals received after the time specified will be considered late and may be disqualified at Anheuser-Busch's discretion.

    2.3. Bidder's responses to this RFP become the property of Anheuser-Busch.  Under no circumstances is Anheuser-Busch bound to return or destroy bidder proposals. Regardless of the Bidder selected, Anheuser-Busch reserves the right to use any information presented

in the proposal to Anheuser Busch's benefit.  Proprietary information submitted in this RFP must be so identified by the Bidder.

3. Completeness of Proposal

   3.1. Prior to the submission of Bidder's proposal, Bidder shall make and be deemed to have made a careful examination of the scope of the RFP.  Bidder should become informed as to the requirements detailed in the RFP and will be required to comply with all applicable codes and regulations.

   3.2. Bidder must identify the RFP name on its proposal.

   3.3. Bidder must comply with all terms and requirements identified in the RFP.   If Bidder rejects any of the provisions of this RFP, Bidder must identify the rejection(s) clearly at the beginning of its response and must specify reason(s) for rejected provision(s), offer an alternative to the rejected provision(s), and explain how Bidder's alternative(s) will provide equal or better functionality.  Unless rejection(s) are specifically noted by Bidder, Bidder will have been deemed to have accepted all terms and requirements identified in the RFP.

4. Revision to RFP

   4.1. In the event it becomes necessary to revise any part of the RFP, an addendum will be provided to all Bidders who received the original RFP.  Any written addendum required under the terms set forth in this RFP shall be given and be deemed to have been duly served if delivered electronically by email to the designated representative of the Bidder.

   4.2. Anheuser-Busch reserves the right to issue revisions to this RFP at any time prior to the closing date.

5. Evaluation and Selection Criteria

   5.1. Anheuser-Busch will use the following criteria to evaluate each proposal.
   - Knowledge of the applicable field of expertise and applicable practices.
   - Technical capabilities of the vendor
   - Compliance with the terms, conditions, and other provisions contained in this RFP.
   - Qualifications, financial position, and experience of the Bidder
   - Proposed pricing
   - Knowledge of the Anheuser-Busch environment
   5.2. Results of this analysis will be the major influencing factor in the decision making process.  However, without knowing the exact circumstances that will exist at the time of the decision, other factors may also influence the decision.

6. Cost of Proposal

    6.1. Anheuser-Busch will not assume any expense incurred by Bidder in preparation of the response to this RFP and also will not return the proposal to the Bidder after a decision is made.

7. Standard Provisions

    7.1. This RFP is not an offer to enter into an agreement with any party, but rather a request to receive proposals from persons interested in providing the services outlined within this request.

    7.2. Oral communications between Anheuser-Busch and Bidder on the subject matter of the RFP or Bidder's proposal during the selection process will not be legally binding.

    7.3. Bidder proposals shall be considered and treated by Anheuser-Busch as offers to enter into an agreement.

    7.4. Proposals submitted in response to this RFP should not be construed as an obligation on the part of Anheuser-Busch to award a contract for any or all services.  Failure of Anheuser-Busch to select a bidder shall not result in any claim whatsoever against Anheuser-Busch.  If a contract does result from this RFP, Anheuser-Busch reserves the right to award all items or any combination of items at Anheuser-Busch's discretion.

    7.5. Any additional or different terms and conditions proposed by Bidder are rejected unless expressly assented to in writing by Anheuser-Busch.

    7.6. The information contained in this RFP may change by either additions or deletions before actual issuing of a contract.

    7.7. Proposals submitted in response to this RFP will be considered firm offers for a period of 120 days from bid close date.  However, in the event Bidder reduces the price of any item or service provided in Bidder's initial bid response, Bidder agrees to immediately pass these reductions on to Anheuser-Busch by submitting a revised proposal.  Bidder warrants that prices provided in Bidder's proposal are no greater than prices being charged any other customer for similar services and schedules with similar specifications.

    7.8. Bidder must strictly adhere to the delivery dates or lead times identified in Bidder's proposal.  Failure to meet these delivery dates may constitute a material breach of Bidder's performance.  If Anheuser-Busch awards a contract to Bidder as a result of this RFP and subsequently is forced to procure additional or alternative services due to Bidder's inability to meet the established delivery date, Bidder will be responsible for any re-procurement costs suffered by Anheuser-Busch.

7.9. Anheuser-Busch and Bidder shall be excused from performance and shall not be liable for any delay in delivery or for non-delivery, in whole or in part, caused by the occurrence of any contingency beyond their reasonable control where Anheuser-Busch and Bidder have exercised reasonable care in the prevention thereof.

Bidder acknowledges that Bidder is, and that Anheuser-Busch relies upon Bidder as, an expert fully competent in all phases involved in the performance of the provisions of this RFP. Anheuser-Busch neither accepts responsibility for, nor relieves Bidder from responsibility for the performance of, all provisions and terms and conditions of this RFP.

8.  Clarifications and Interpretation of RFP

8.1. If Bidder discovers an inconsistency, Bidder should contact Loren Foster at (314) 765-2144 or via email at loren.foster@anheuser-busch.com. Addenda will be provided to all Bidders per Section 4.1 above.

8.2. If Bidder has questions or requires clarification of the RFP, Bidder should submit Bidder's request to Loren Foster at (314) 765-2144 or via email at loren.foster@anheuser-busch.com.

9.  Negotiations and Contract Award

9.1. Anheuser-Busch reserves the right to select, at its discretion, any proposal, or to reject any or all proposals submitted, or to defer the decision, or to enter into negotiations with any party to provide such services whether a recipient of the RFP or not.

**Request for Proposal & Description of Services**

**Section I:  Current Situation**

Anheuser-Busch Companies, LLC is seeking a vendor to provide warehousing services for our delivered imports product in the Los Angeles, California area. Warehoused material will include various SKU's of our beer product imported from outside of the United States.

The service provider should be prepared to receive inventory as early as 29 March 2016. Please advise your start date for receipts in your response to this request.

**Section II:   Description of Services Needed**

This section identifies the potential scope of this project and an overview of the services/deliverables to address.  Listed below are the services that Anheuser-Busch will expect from the Bidder and should be included in your pricing.  Unless otherwise stated, it will be assumed your firm will be offering the full scope of each service, which will be included in your bid.  Bidder is encouraged to recommend additional best practices not included herein, based upon the services they provide to existing clients.

*1.      Day to Day Operations*

Anheuser-Busch will be responsible for determining the quantity and timing of shipments into the warehouse provider, as well as the timing and makeup of outbound shipments to its destination facilities.  Bidder is required to adhere to AB's inventory tracking system for shipments. Product will be received via full pallets and loaded and shipped via full pallets only. There is no requirements existing today for handling of partial pallets.

*2.      Storage Requirements*

AB requires that the bidder have the capacity to warehouse a minimum capacity of estimated 50,000 (fifty thousand) square feet of warehouse space. The requirements for storage space could change by +/- 20,000 square feet based on seasonality or inbound or outbound volume. NOTE: In sizing our estimates we are assuming stacking pallets three high. In addition to general storage of product warehouseman should ensure that there is appropriate space for empty ocean containers awaiting return to port, and full containers awaiting off-load into the storage facility. It is preferred that this "drop" space be controlled and operating 24/7 to allow for staging of receipts and return pick-ups.

Warehouseman shall operate the Warehouses (i) 8am and 5pm M-F., Monday through Friday, and (ii) on an emergency basis following telephone notice from AB, 365 days a year. During the required hours of operation Warehouseman shall perform the following Services:

Warehouseman shall receive and store Goods shipped to the Warehouses.

Warehouseman shall execute and faithfully render the Services set forth in this Agreement and the applicable AB release documents.

Warehouseman shall ship Goods in accordance with AB's instructions

| Category | Specs |
|---|---|
| Weekly Inbound Max - 20 Pallets | ~170 Loads Unloaded |
| Weekly Outbound Max - 20 Pallets | 80 Outbound/Week |
| **Avg. Weekly Inbound - 20 Pallets** | **60 Inbound/Week** |
| Avg. Weekly Outbound - 20 Pallets | 60 Outbound/Week |
| SKU Count | 40 |
| Average SKUs per Outbound Load | 11 |
| Date Rotation | AB Manages Ages |
| Storage Time | 14 Days Average; 8-10 DOI Storage Needed |
| Pallet Stacking | 3 High |
| Pallet Dimensions | 40 X 48; 40 X 44 |

In your response to this request. Please indicate your ability and availability of ambient storage in addition to refrigerated storage options. This will be for the storage and handling of beer. Please ensure you are authorized by state and governments for the requirements to manage this commodity of product.

Requirements exist for the secured storage and staging of empty and/or full ocean containers as part of this project (arrivals to and from port). Please indicate your ability and space. It is preffered that our delivery of full containers operate on a drop and hook basis, or live unloads when available to maximize return trips to port with empties.

*3.     Preferred Length of Agreement*

The term of the agreement shall be a one or two year term with two one year options at AB's discretion. It is Anheuser-Busch's intention that terms and conditions of the agreement will be based on our mutual best interests. AB maintains termination for convenience throughout the term of any agreement.

*4.     Normal Hours of Operations*

The Operator shall operate the warehouse from 0:00 a.m. to 24:00 p.m., Sunday through Saturday, 24/7. Warehouseman shall operate the Warehouses (i) 8am and 5pm M-F., Monday through Friday, and (ii) on an emergency basis following telephone notice from AB, 365 days a year. As this project is conceptual today, the working hours may be mutually revised to maximize operations and reduce combined total cost of operations.

*5.     Auditing Procedures & Record Retention*

The Operator is required to maintain appropriate records for all services. Anheuser-Busch will reserve the right to review and audit the records during the term of the contract and 3 years thereafter.

6.     *Protection of Goods*

Warehouseman shall preserve and maintain the Goods in as good a condition as when received, subject to the terms hereof.  At any time requested by AB, or at the expiration or termination of the formal Agreement, Warehouseman shall promptly return any Goods to AB or to such other location as directed by AB.

Warehouseman shall be responsible for any loss or damage to the Goods while in Warehouseman's care, custody and control due to the negligence or actionable fault of Warehouseman, its employees, agents, contractors and invitees.

Warehouseman shall provide and maintain at each of the Warehouses, at its sole cost and expense, a state-of-the-art electronic security service consistent with systems currently in operation in that area.

Warehouseman shall carry a fidelity bond covering its employees with a limit of not less than $3,000,000.   At AB's request, Warehouseman shall furnish additional bonds, covering Warehouseman's full and faithful performance of all obligations under a Formal Agreement from and in a form and amount reasonably requested by AB.

7.   *Rights of Parties in Goods*

In connection with the Services, AB will deliver Goods to the Warehouse designated by AB in care of Warehouseman.  Warehouseman shall serve as AB's bailee for the Goods.  At all times, the Goods shall remain the sole property of AB and Warehouseman shall take reasonable means to store, situate and maintain the Goods in a manner so as to be readily and clearly identifiable as AB's Goods and physically segregate the Goods from Warehouseman's property and the property of others.  Warehouseman shall take all necessary steps to keep its property and other's property from being commingled with the Goods.

Title to the Goods shall not pass to Warehouseman under any circumstances.  Warehouseman shall not claim any rights of ownership in any of the Goods and shall not encumber, lease, transfer, or otherwise dispose of any part of the Goods, except as expressly permitted or instructed by AB in writing.  Warehouseman hereby waives and releases any claim, right, or lien that Warehouseman may now or hereafter have against any or all of the Goods owned by AB.

8.   *Insurance Requirements*

At all times during the Term, Warehouseman shall maintain insurance written by solvent insurance companies reasonably acceptable to AB, naming AB as an additional insured and providing the following coverage:

Commercial general liability insurance in occurrence form, insuring AB and Warehouseman against any and all liability for injury to or death of a person or persons, and for damage to or destruction of property, occasioned by or arising out of or in connection with the use of the Warehouse and including contractual liability insurance covering the liability assumed by Warehouseman under the indemnity set forth below, with a minimum combined single limit of liability of at least six million dollars ($6,000,000.00);

Warehouseman's legal liability insurance coverage covering loss of or damage to the Goods while they are located in or about the Warehouse in the amount of six million dollars ($6,000,000.00), notwithstanding any "limitation of Warehouseman's liability" that may be stated on any warehouse receipt.

Standard all risk property and casualty insurance on the Warehouses, with a guaranteed replacement cost endorsement, against those risks normally encompassed in an all risk policy; and

Workers' compensation insurance and similar insurance offering statutory coverage and containing statutory limits and employers' liability insurance in form and amount acceptable to AB.  A waiver of subrogation in favor of Anheuser-Busch Companies, LLC and its subsidiaries and affiliates shall be applicable on the Workers' compensation and employers' liability policies

No policy shall contain a self-insured retention greater than Twenty-Five Thousand Dollars ($25,000).  Further, irrespective of any deductible under said policy, the insurer shall pay third-party losses on a first dollar basis.  Any self-insured retention or deductible under said policy shall be the sole responsibility of Warehouseman and shall not apply to AB.  Such policy shall include an endorsement so that AB will be notified of early cancellation of the policy at least thirty (30) days prior to the effective date of such cancellation.  Notice shall be addressed to AB at the address provided in this Agreement.

Certificates of Insurance evidencing satisfaction of the above requirements shall be filed with AB's data management services supplier, Insurance Data Services, immediately upon execution of a formal Agreement and upon each anniversary of the date hereof at the following address: Anheuser-Busch Companies, LLC, c/o Insurance Compliance, PO Box 12010-AB, Hemet, CA 92546-8010.  Warehouseman shall not violate, or permit to be violated, any conditions of any said policies and shall at all times satisfy the requirements of the insurance companies writing said policies. Failure to so comply or to provide and maintain the required insurance coverage shall be a material breach of this Agreement by Warehouseman.

Any additional cost incurred by the provider to maintain the required insurance must be factored into the quoted rates.

9.   *Miscellaneous Services; Inventory Management & Control*

Warehouseman shall provide the following Services at no additional cost to AB:

Supply all gas, electricity, water and other utilities necessary for the satisfactory and continuous operation of the Warehouses.

Provide the services of full time warehouse personnel dedicated to the provision of Services to, and the benefit of, AB.

Provide the services of full time employees for care and control of Goods stored at the Warehouses with responsibility for review of inbound and outbound Goods shipments.

Maintain full complete and auditable records by means of an automated accounting system for inventory control and record keeping which is compatible with the inventory control systems utilized by AB, and provide related data processing service.

Maintain records of physical inventory results and perpetual accounting records for use by AB and all other record keeping deemed necessary or appropriate by AB in connection with the operation of the Warehouses.

Provide AB with monthly and quarterly sales and inventory reports.

Maintain the Warehouses in a condition satisfactory to AB, including any necessary repairs, proper housekeeping, or replacements and pest control programs.

Obtain AB's pre-approval for all labor, freight, repair work and any operation that will result in an additional charge to AB.  Failure by Warehouseman to obtain such AB approval prior to Warehouseman's incurring such additional costs shall relieve AB from any obligation to reimburse Warehouseman for such costs and shall be considered a material breach of this Agreement.

10.    *Warehouse Contamination Prevention Program*

In order to prevent contamination of AB products or packaging materials, the following will be required by Warehouseman:

Warehouseman shall implement an effective Product Tampering Policy, at least as comprehensive as that set out below in this in Exhibit A, and each of Warehouseman's employees shall acknowledge in writing his/her understanding and acceptance of the policy.

Warehouseman shall implement pre-employment background checks (including criminal and driving record) and drug screen.

The Warehouse shall have adequate internal and external lighting and be equipped with appropriate access security measures designed to deter entry by unauthorized personnel.

Warehouseman shall hold annual communications with employees to emphasize intolerance for tampering and intentional or unintentional contamination of materials or products.

Warehouseman shall consider the development and deployment of a "Distribution Center Standard Operating Procedures Manual" to incorporate the above-listed items

11.    *Payment Terms Requirements*

Vendor should base their pricing and proposal on the payment terms below.

Anheuser-Busch will pay "net 120 days" upon completion of work and receipt of a valid invoice in accordance with applicable Company policies and practices.

Invoices are due and payable on the next regularly scheduled disbursement date for payment by AB of accounts payable occurring after 120 days of transaction date.  Vendor shall provide AB with supporting documentation, as AB shall reasonably request.  AB may withhold payment of an invoice that AB reasonably determines is incorrect or in dispute, as long as AB is working with

Vendor in good faith to resolve the discrepancy or dispute. AB will pay Vendor for charges via an auto payment process. There will be no need for normal billing from vendor.

## Section III:  Project Schedule

Anheuser-Busch Companies, LLC will award a contract for warehouse services.  Key dates are as follows:


RFP Delivered by: March 10, 2016

Proposal Due by: March 17, 2016 (advise if more time needed)

Conference Calls and/or Meeting with ABI Logistics and Procurement: Invite only (based on RFP rank) no later than 4/11/2016.

Final E-Auction by: TBD




*See next page for bidder response information*

# Bidder Response Information

## Section I:  Bidder Response

The bidder is required to submit a bid response based on the pricing structure below. Pricing must be based on the outlined scope of work above. Absolutely no additional costs/pricing will be accepted outside this model. Please feel free to add supplemental information regarding your operations but use this document at a minimum to list cost components.

| Vendor Rates | |
|---|---|
| Handling | $X.XX per Pallet |
| Storage (Split Month) | $X.XX per Pallet |
| Recurring Storage | $X.XX per Pallet |
| Bill of Lading | $X.XX per Pallet |
| Other Fee (Please Detail) | |
| Other Fee (Please Detail) | |
| Other Fee (Please Detail) | |

| Bidder Warehouse Information | |
|---|---|
| Warehouse address | |
| Square footage | |
| Earliest Date Available | |
| Distance in Miles from Port of Los Angeles | |

| Other Asks | Answer Y/N |
|---|---|
| Rail Capable | |
| In Heavy Haul Long Beach Corridor | |
| 24/7 Secured Drop Lot access | |
| | |

AB has included a copy of our standard warehousing agreement below in Appendix B for the bidders review as you prepare your bid.

## APPENDIX A - PRODUCT TAMPERING POLICY

Our customers place the highest possible importance on the safety, quality and integrity of their products.  The inclusion of any foreign material as well as damage done to any of our customers' products is a serious incident affecting the safety and integrity of our customers' products and our relationship with our customers.  Tampering of any kind with our customers' products cannot be tolerated.

Many of our customers' products are regulated by the government and must comply with strict guidelines regarding safety, quality and integrity of the package ultimately provided to the end consumer.  As such, there are significant consequences for all parties who engage in tampering with any of our customers' products.  As a warehouse service provider, we must insure that no tampering with our customers' products or materials occurs while those items are in our custody or control.  We will not tolerate the intentional or unintentional contamination of our customers' products.

Therefore, this document provides actual notice to you, the warehouse employee, that we have instituted this policy prohibiting any tampering with our customers' products or materials.  All employees who handle products stored in our warehouse or under our control, must understand and comply with this policy, and all procedures developed to insure that no tampering or contamination occurs.  Any warehouse employee found to be involved in a tampering incident, whether directly or indirectly, will be subject to disciplinary action, up to and including termination of employment, and may also be subject to criminal prosecution, and civil liability for any damages caused.

If any employee is aware or becomes aware of any tampering or contamination, whether intentional or unintentional, with any products or materials, he or she should immediately report that information to his or her supervisor.  If an employee is aware of tampering or contamination to our customers' product or materials and fails to "promptly" report knowledge of the tampering or contamination, that employee may also be subject to disciplinary action.  Reporting "promptly" means prior to the time the product or material in question leaves our custody or control.

I affirm that I have read and understood this policy prohibiting tampering and contamination with our customers' products and materials and will comply with this policy.


_____                    _____

Employee Name                                                             Date

**APPENDIX B: STANDARD WAREHOUSE AGREEMENT**

## WAREHOUSING AGREEMENT

This Agreement, dated _____, is by and between _____, a _____ corporation with offices located at _____ ("Warehouseman"), and Anheuser-Busch, LLC, a Missouri limited liability company with offices at One Busch Place, St. Louis, Missouri 63118, on behalf of itself and its affiliated companies ("AB").

WITNESSETH:

1. WHEREAS AB requires supplemental storage space for warehousing material, equipment, parts and supplies ("Goods") and AB desires to retain the services of an independent warehouse organization to transport, warehouse, store, hold pending sale and deliver the Goods as directed by AB; and

2. WHEREAS Warehouseman operates the warehouse facility(ies) designated in Exhibit A (the "Warehouse(s)") for the purposes of receiving, warehousing, and shipping of material, equipment, parts and supplies, and Warehouseman desires to provide certain services required by AB in connection with the Goods;
NOW THEREFORE in consideration of the mutual covenants and promises herein contained, Warehouseman and AB agree as follows:

A. TERM. This Agreement shall commence on _____, and expire at midnight on _____ ("Term"), unless terminated earlier in accordance with the terms hereof.

B. RELATIONSHIP OF WAREHOUSEMAN AND AB; USE OF WAREHOUSE.

1. AB hereby retains Warehouseman as an independent contractor during the Term of this Agreement to provide the services ("Services") described in Exhibit A attached hereto. In the performance of its obligations hereunder, Warehouseman shall comply with all AB procedures governing the warehousing of AB goods and inventory.

2. Warehouseman's relationship to AB is that of an independent contractor and neither AB nor Warehouseman shall represent to anyone that Warehouseman is other than an independent contractor in relation to AB. Warehouseman shall have in its employ a sufficient number of properly trained employees to enable Warehouseman to render the Services in a first-class manner. Warehouseman shall have total responsibility for and shall fully comply with all applicable federal, state and local laws, ordinances, building codes, fire codes, rules, laws and regulations including, but not limited to those concerning workers' compensation, social security, unemployment insurance, hours of labor, wages, working conditions and other employee-employer related subjects and AB shall have no liability with respect thereto. Warehouseman shall observe all applicable laws, including but not limited to spill protection and Community Right To Know obligations, and recommendations of the National Fire Protection Association relating to storage and handling of each type of Goods.

C.     RIGHTS OF PARTIES IN GOODS.

1.     In connection with the Services, AB will deliver Goods to the Warehouse designated by AB in care of Warehouseman.  Warehouseman shall serve as AB's bailee for the Goods.  At all times, the Goods shall remain the sole property of AB and Warehouseman shall take reasonable means to store, situate and maintain the Goods in a manner so as to be readily and clearly identifiable as AB's Goods and physically segregate the Goods from Warehouseman's property and the property of others. Warehouseman shall take all necessary steps to keep its property and other's property from being commingled with the Goods.

2.     Title to the Goods shall not pass to Warehouseman under any circumstances. Warehouseman shall not claim any rights of ownership in any of the Goods and shall not encumber, lease, transfer, or otherwise dispose of any part of the Goods, except as expressly permitted or instructed by AB in writing.  Warehouseman hereby waives and releases any claim, right, or lien that Warehouseman may now or hereafter have against any or all of the Goods owned by AB.

3.     Concurrent with the execution and delivery of this Agreement, and thereafter at such time as AB deems necessary and/or appropriate to evidence AB's title and interest in the Goods; provided however, Warehouseman grants AB the right to (a) file UCC-1 financing statements (and continuations thereof) which have not been executed by Warehouseman and (b) if required by the filing jurisdiction, execute UCC-1 financing statements (and continuations thereof) for and on behalf of Warehouseman as its attorney-in-fact to such limited extent, in each instance to the extent permitted by applicable law and if not permitted, Warehouse shall execute and deliver to AB for filing any such required UCC-1 Financing Statement.

D.     COMPENSATION OF WAREHOUSEMAN.  AB shall pay Warehouseman, for its satisfactory performance of the Services, the amounts set forth in Exhibit B attached hereto.

E.     PROTECTION OF GOODS.

1.     Warehouseman shall preserve and maintain the Goods in as good a condition as when received, subject to the terms hereof.  At any time requested by AB, or at the expiration or termination of this Agreement, Warehouseman shall promptly return any Goods to AB or to such other location as directed by AB.

2.     Warehouseman shall be responsible for any loss or damage to the Goods while in Warehouseman's care, custody and control due to the negligence or actionable fault of Warehouseman, its employees, agents, contractors and invitees.  At all times during the Term, Warehouseman shall maintain insurance written by solvent insurance companies reasonably acceptable to AB, naming AB as an additional insured and providing the following coverage:

(a)     Commercial general liability insurance in occurrence form, insuring AB and Warehouseman against any and all liability for injury to or death of a person or persons, and for damage to or destruction of property, occasioned by or arising out of or in connection with the use of the Warehouse and including contractual liability insurance covering the liability assumed by Warehouseman under the indemnity set forth below, with a minimum combined single limit of liability of at least six million dollars ($6,000,000.00);

(b)     Warehouseman's legal liability insurance coverage covering loss of or damage to the Goods while they are located in or about the Warehouse in the amount of six million dollars ($6,000,000.00), notwithstanding any "limitation of Warehouseman's liability" that may be stated on any warehouse receipt;

(c)     Standard all risk property and casualty insurance on the Warehouses, with a guaranteed replacement cost endorsement, against those risks normally encompassed in an all risk policy; and

(d)     Workers' compensation insurance and similar insurance offering statutory coverage and containing statutory limits and employers' liability insurance in form and amount acceptable to AB.  A waiver of subrogation in favor of Anheuser-Busch Companies, LLC and its subsidiaries and affiliates shall be applicable on the Workers' compensation and employers' liability policies

3.      No policy shall contain a self-insured retention greater than Twenty-Five Thousand Dollars ($25,000).  Further, irrespective of any deductible under said policy, the insurer shall pay third-party losses on a first dollar basis.  Any self-insured retention or deductible under said policy shall be the sole responsibility of Warehouseman and shall not apply to AB.  Such policy shall include an endorsement so that AB will be notified of early cancellation of the policy at least thirty (30) days prior to the effective date of such cancellation.  Notice shall be addressed to AB at the address provided in this Agreement.

4.      Certificates of Insurance evidencing satisfaction of the above requirements shall be filed with AB's data management services supplier, Insurance Data Services, immediately upon execution of this Agreement and upon each anniversary of the date hereof at the following address:  Anheuser-Busch Companies, LLC, c/o Insurance Compliance, PO Box 12010-AB, Hemet, CA  92546-8010.  Warehouseman shall not violate, or permit to be violated, any conditions of any said policies and shall at all times satisfy the requirements of the insurance companies writing said policies. Failure to so comply or to provide and maintain the required insurance coverage shall be a material breach of this Agreement by Warehouseman.

5.      Warehouseman hereby agrees to indemnify, defend and save AB, and its affiliates and subsidiaries, and their respective servants and employees, harmless from any and all Loss (as hereinafter defined) where Loss is caused or incurred as a result of (a) a breach of any obligation on the part of Warehouseman under this Agreement; (b) the

negligence or other actionable fault of Warehouseman or any of its employees, agents, contractors or invitees which results in personal injury (including death) and/or property damage, including damage to the Goods held by Warehouseman hereunder; (c) any claims arising out of Warehouseman's previous affiliation with any entity or individual previously or currently affiliated with Warehouseman or (d) any injury or damage whatsoever arising out of the volatility or instability of the Goods while in the care of Warehouseman or its contractors in the Warehouse or during transport, whether or not Warehouseman's breach or negligence is the cause of such injury or damage. "Loss" as used herein means any and all loss, damage, liability, or expense, whether incurred as a judgment, settlement, penalty, fine or otherwise (including reasonable attorneys' fees and cost of defense), resulting from any action, proceeding or claim of others including employees, representatives or agents of the parties hereto, arising out of the performance of services and obligations of Warehouseman under this Agreement, including but not limited to loss of or damage to the Goods. Such indemnity shall survive the expiration or termination of this Agreement.

6.      The Goods and all records pertaining thereto shall be stored by Warehouseman in buildings considered to be good fire risks and free from excess moisture.

7.      Warehouseman shall provide and maintain at each of the Warehouses, at its sole cost and expense,  a state-of-the-art electronic security service consistent with systems currently in operation in that area.

8.      Warehouseman shall carry a fidelity bond covering its employees with a limit of not less than $3,000,000.  At AB's request, Warehouseman shall furnish additional bonds, covering Warehouseman's full and faithful performance of all obligations under this Agreement from and in a form and amount reasonably requested by AB.

F.      CASUALTY OR CONDEMNATION.  Warehouseman shall immediately provide AB written notice of any damage or taking by casualty or condemnation of the Warehouses. If the Warehouses or any portion thereof are so damaged or taken by casualty or condemnation that a Warehouse used under this Agreement is rendered unfit, unsafe, insufficient and/or inaccessible for the uses intended and such condition cannot be or is not fully and properly corrected within 15 days after the day on which such condition occurs and AB does not choose to terminate this Agreement as set forth herein, then Warehouseman shall promptly correct such conditions by, without limitation, repairing such damage, if any, and restoring the Warehouses to a condition substantially similar as existed immediately prior to the occurrence of such condition.

G.      ACCESS BY AB.  AB, its employees, representatives and agents shall have access to the Warehouse(s) during normal business hours to inspect each facility, such records and papers as pertain to AB's business, and the Goods and the handling thereof.

H.      SHIPMENTS FROM WAREHOUSES.

1.      Warehouseman shall make shipments of the Goods only as AB may authorize in writing and only on the terms specifically set forth in an applicable shipment order.

2.      Included in the Services hereunder, Warehouseman shall supply, as an included cost, any materials necessary to pack and prepare the Goods for domestic shipment.  AB shall reimburse Warehouseman for any additional costs actually incurred by Warehouseman in packaging the Goods for export as directed by AB.

I.      TRANSPORTATION AND DRAYAGE.  AB shall pay for all transportation and drayage of the Goods in and out of the Warehouse at the rates provided in Exhibit C.  AB may, from time, provide to Warehouseman a list of preferred carriers for Warehouseman to utilize for all transportation and drayage of the Goods in and out of the Warehouse.  Warehouseman shall not utilize any carrier other than one of the carriers set forth on the then current list (if any) of preferred carriers without AB's prior written consent.

J.      RECORDS OF WAREHOUSEMAN.

1.      Warehouseman shall keep complete records of all Goods received, stored and shipped.  Physical counts of the Goods shall be made as directed by AB, but no less frequently than monthly, and a complete report of such inventories shall be given to AB.  All records or papers of any kind relating to any business of AB shall be and remain at all times, the property of AB and shall be surrendered to AB on demand.

2.      Except as otherwise specifically provided in this Agreement, each party shall be responsible for any expenses incurred by such party in connection herewith.

3.      For a period of at least two (2) years following the termination of this Agreement, Warehouseman shall maintain such books and records (collectively, "Records") as are necessary to substantiate that (i) all invoices and other charges submitted to AB for payment hereunder were valid and proper, and (ii) no payments have been made, directly or indirectly, by or on behalf of Warehouseman to or for the benefit of any AB employee or agent who may reasonably be expected to influence AB's decision to enter into this Agreement, or the amount to be paid by AB pursuant hereto.  (As used herein, "payments" shall include money, property, services, and all other forms of consideration.)  All Records shall be maintained in accordance with generally accepted accounting principles consistently applied.  AB and/or its representative shall have the right to examine said Records at any time.

K.      CONFIDENTIALITY.  All of the information which Warehouseman obtains and/or develops in the performance of this Agreement shall be treated, maintained and held by Warehouseman as confidential information, which Warehouseman shall not disclose without AB's prior written consent in each instance ("Confidential Information").  Notwithstanding the foregoing prohibition on disclosure, Warehouseman may disclose Confidential Information to its employees, counsel, and other professional advisors if disclosure is required in connection with Warehouseman's provision of Services under this Agreement and such employees, counsel and other advisors agree in writing to be

bound by the terms of this paragraph.  Warehouseman may also disclose Confidential Information if it is required to do so by applicable statute, rule, regulation or judicial or administrative process or order; provided, however, that Warehouseman shall promptly notify AB of any such request or requirement so that Warehouseman or AB, or both, may seek an appropriate protective order.  Upon expiration or earlier termination of this Agreement, Warehouseman shall return all copies of any Confidential Information to AB or shall certify to AB that all copies of Confidential Information in Warehouseman's control have been destroyed.  In the event of a breach or threatened breach by Warehouseman of the provisions of this paragraph, AB shall be entitled to an injunction restraining Warehouseman from disclosing, in whole or in part, any such Confidential Information or from rendering any service to any third party to whom the Confidential Information, in whole or in part, has been disclosed or to whom Warehouseman is threatening to disclose same.  Nothing herein shall be construed as prohibiting AB from pursuing any other remedies available to AB for such breach or threatened breach, including the recovery of damages.  The obligations of Warehouseman hereunder shall survive the expiration or earlier termination of this Agreement.

L.    TERMINATION OF AGREEMENT.

1.    This Agreement shall remain in full force and effect from the date hereof until the expiration of the Term hereof, unless sooner terminated in accordance with the terms hereof.  Either party shall have the right at any time to terminate this Agreement, effective upon the other party's receipt of the termination notice, without prejudice to any other legal rights to which such terminating party may be entitled, upon the occurrence of any one or more of the following:

(a)    Default by the other party in performance of any of the provisions of  this Agreement or in any other agreement between the parties, which default is not cured within thirty (30) days following written notice of such default to the defaulting party; or

(b)    If any of the representations or warranties made by the other party in this Agreement shall prove to be untrue or inaccurate in any material respect.

2.    AB shall have to right to terminate this Agreement effective upon notice thereon or on the date specified in the termination notice upon the happening of any of the following events:

(a)    the making by Warehouseman of any general arrangement or general assignment for the benefit of creditors;

(b)    Warehouseman becomes a "debtor" as defined in 11 U.S.C. Section 101 or any successor statute thereto (unless in the case of a petition filed against the Warehouseman, the same is dismissed within 60 days);

(c)     the appointment of a trustee or receiver to take possession of substantially of Warehouseman's assets or the owners' of the Warehouses assets, located at either or both of the Warehouses;

(d)     the attachment, execution or other judicial seizure of substantially all of Warehouseman's assets or the owners' of the Warehouses assets, located at either or both of the Warehouses and such seizure is not discharged within 30 days;

(e)     a Warehouse, or any portion thereof used under this Agreement, is in AB's reasonable judgment, so damaged or taken by casualty or condemnation that it is rendered unfit, unsafe, insufficient and/or inaccessible for the uses intended by this Agreement, and such condition cannot be or is not fully and properly corrected within 15 days after the day on which the condition occurs.

3.      In addition, AB may terminate this Agreement for its convenience and without liability to Warehouseman, upon 30 days prior written notice.

4.      Termination of this Agreement for any reason provided herein shall not relieve either party from its obligation to perform up to the effective date of such termination or to perform such obligations as may survive termination.

5.      In the event of termination, AB may continue to store Goods at the Warehouse for a period of not more than three (3) months following such termination in order to facilitate relocation of the Goods to an alternate storage location and this Agreement shall be in full force and effect during such period.  Warehouseman shall properly pack and ship any of the Goods remaining in its possession, as instructed, to the location designated by AB.  In the event AB terminates this Agreement for its convenience or Warehouseman terminates this Agreement pursuant to paragraph 1 of this Section, AB shall compensate Warehouseman for costs and expenses actually incurred by Warehouseman in preparing for and shipping the Goods to an alternate storage location.

M.      REPRESENTATIONS AND WARRANTIES.

1.      Warehouseman represents, warrants and covenants to AB as follows:

(a)     It has the full right and legal authority to enter into and fully perform this Agreement in accordance with its terms.

(b)     This Agreement when executed and delivered by Warehouseman, will be its legal, valid and binding obligation enforceable against Warehouseman in accordance with its terms, except to the extent that enforcement thereof may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally.

(c)     The execution and delivery of this Agreement have been duly authorized by Warehouseman, and such execution and delivery and the performance by Warehouseman of its obligations hereunder, do not and will not violate or cause a breach

of any other agreements or obligations to which it is a party or by which it is bound, and no approval or other action by any governmental authority or agency is required in connection herewith.

(d)      The facility detail specified in Exhibit A is true and correct.

(e)      In addition to being true as of the date first written above, each of the foregoing representations, warranties, and covenants shall be true at all times during the Term hereof.  Each of such representations, warranties and covenants shall be deemed to be material and to have been relied upon by AB notwithstanding any investigation made by AB.

(f)      Warehouseman represents, warrants and covenants to AB that Warehouseman's computer and other automated systems at all times:  (a) will properly process, manage and manipulate data involving dates, including, without limitation, single century and multi-century formulae and leap year calculations and will properly calculate, compare and sequence from, into and between the twentieth and twenty-first centuries; (b) will not cause an abnormally ending scenario or result in the generation of incorrect values or data or invalid results involving such dates; and (c) will include the correct date in all date-related functions and data fields.  As part of its warranty obligations, Warehouseman will promptly correct any errors relating to date data, specifically including any error relating to, or the product of, date data which represents or references different centuries or more than one century.  Notwithstanding any other provision of this Agreement, the foregoing warranty shall continue for as long as this Agreement is in effect.   In no event will Warehouseman's failure to comply with the foregoing warranty be considered an event of force majeure.

2.      AB represents, warrants and covenants to Warehouseman as follows:

(a)      It has the full right and legal authority to enter into and fully perform this Agreement in accordance with its terms.

(b)      This Agreement when executed and delivered by AB, will be its legal, valid and binding obligation enforceable against AB in accordance with its terms, except to the extent that enforcement thereof may be limited by bankruptcy, insolvency or other similar laws affecting creditors' rights generally.

(c)      The execution and delivery of this Agreement have been duly authorized by AB, and such execution and delivery and the performance by AB of its obligations hereunder, do not and will not violate or cause a breach of any other agreements or obligations to which it is a party or by which it is bound, and no approval or other action by any governmental authority or agency is required in connection herewith.

N.      NO ASSIGNMENTS; SECURITY FOR AB; MISCELLANEOUS.

1.      Warehouseman shall not assign, mortgage, pledge, hypothecate, or otherwise encumber this Agreement, or any right, privilege or interest hereunder, and none of the same may be assigned by operation of law, and Warehouseman may not delegate the performance of its obligations hereunder without, in each instance, the prior written consent of AB.

2.      In order to secure the performance of this Agreement by Warehouseman, and to protect the Goods of AB stored in the Warehouse or otherwise in the control of Warehouseman, and as a condition to this Agreement remaining effective, Warehouseman shall provide AB with security, in all respects satisfactory to AB in form and substance as determined in the sole discretion of AB, such as, without limitation,  a memorandum of AB's rights hereunder and/or any other agreement(s) which AB may require, such as, without limitation, a lease or license agreement for AB to enter upon and operate those portions of the Warehouse that is dedicated to the Goods.

3.      The failure of AB to insist upon prompt and strict performance of any of the terms, conditions or undertakings of this Agreement, or to exercise any right herein conferred, in any one or more instance, shall not be construed as a waiver of the same or any other term, condition, undertaking, right or option.

4.      If any term or condition of this Agreement or the application thereof to any person or event shall to any extent be invalid and unenforceable, the remainder of the Agreement and the application of such term, covenant or condition to persons or events other than those to which it is held invalid or unenforceable shall not be affected and each term, covenant and condition of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

5.      This Agreement cannot be altered or varied except by a written instrument signed by both parties which expressly refers to this Agreement and the provision(s) to be modified.

6.      Without regard to its conflicts of laws principles, the laws of the state of Missouri shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and obligations of the Warehouseman and AB hereunder; provided, however, that the commercial code as in effect in the state in which a Warehouse is located shall govern regarding all security and notice filings required or permitted by this Agreement.

7.      Subject to the consent requirements set forth in paragraph 1 of this Section N, this Agreement shall be binding on the parties hereto and their respective successors and assigns.

8.      Should any party commence legal action to interpret or enforce the terms of this Agreement, the prevailing party in such action shall be entitled to recover reasonable attorneys' fees and costs, including, without limitation, attorneys' fees and court costs

incurred at the trial and appellate levels and in any bankruptcy, reorganization, insolvency, or other similar proceedings.

9.      The equal employment opportunity and affirmative action requirements set forth in 41 CFR Part 60-1.4(a) (race, color, sex and national origin, 41 CFR Part 60-250.5(a) (covered veterans) and 41 CFR Part 60-741.5(a) (individuals with disabilities) and the "employee notice" provisions of 29 CFR Part 470 are hereby incorporated by reference into this Agreement.

O.      ENTIRE AGREEMENT.  This Agreement, including all exhibits hereto, constitutes the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous written or oral agreements with regard thereto. Except for AB's warehouse procedures, which may be modified by AB from time to time in its discretion, this Agreement may be amended and modified only by a writing signed by an authorized representative of both parties.

IN WITNESS WHEREOF, the parties here executed this Agreement the day and year first above written.

Supplier

WAREHOUSEMAN:

Signature: _____

Printed Name: _____

Title: _____

Anheuser-Busch Companies, LLC

Signature: _____

Printed Name: _____

Title:  _____

and

Signature: _____

Printed Name: _____

Title: _____

**EXHIBIT A**
**FACILITY DETAIL**

The facility(ies) consists of the following building(s) located at _____ (street address) _____.

BLDG Name /#_____square feet capacityMinimum clear ht.    Max dimensions of items to be stored

The site includes approximately (_____) (__) acres to accommodate open but secured trailer and or container storage.
*************
If multiple physical locations are involved, prepare a separate facility detail listing by street address for each distinct physical location.

GOODS TO BE STORED

UN1197 Flammable Liquid Extract/Flavorings.  This requires cold storage.  Typical flash point for the materials is 69º F.  MSDS will be provided for each material. Needs to be kept above 40º F to avoid crystallization of product.

SERVICES

Warehouseman shall operate the Warehouses (i) 8am and 5pm M-F., Monday through Friday, and (ii) on an emergency basis following telephone notice from AB, 365 days a year.  During the required hours of operation Warehouseman shall perform the following Services:

a)      Warehouseman shall receive and store Goods shipped to the Warehouses.

b)      Warehouseman shall execute and faithfully render the Services set forth in this Agreement and the applicable AB release documents.

c)      Warehouseman shall ship Goods in accordance with AB's instructions set forth in this Agreement and the applicable AB release documents.

MISCELLANEOUS SERVICES; INVENTORY MANAGEMENT AND CONTROL

Warehouseman shall provide the following Services at no additional cost to AB:

a)      Supply all gas, electricity, water and other utilities necessary for the satisfactory and continuous operation of the Warehouses.

b)      Provide the services of full time warehouse personnel dedicated to the provision of Services to, and the benefit of, AB.

c)      Provide the services of full time employees for care and control of Goods stored at the Warehouses with responsibility for review of inbound and outbound Goods shipments.

d)      Maintain full complete and auditable records by means of an automated accounting system for inventory control and record keeping which is compatible with the inventory control systems utilized by AB, and provide related data processing service.

e)      Maintain records of physical inventory results and perpetual accounting records for use by AB and all other record keeping deemed necessary or appropriate by AB in connection with the operation of the Warehouses.

f)      Provide AB with monthly and quarterly sales and inventory reports.

g)      Maintain the Warehouses in a condition satisfactory to AB, including any necessary repairs, proper housekeeping, or replacements and pest control programs.

h)      Obtain AB's pre-approval for all labor, freight, repair work and any operation that will result in an additional charge to AB.  Failure by Warehouseman to obtain such AB approval prior to Warehouseman's incurring such additional costs shall relieve AB from any obligation to reimburse Warehouseman for such costs and shall be considered a material breach of this Agreement.

## WAREHOUSE CONTAMINATION PREVENTION PROGRAM

In order to prevent contamination of AB products or packaging materials, the following will be required by Warehouseman:

1.      Warehouseman shall implement an effective Product Tampering Policy, at least as comprehensive as that set out below in this in Exhibit A, and each of Warehouseman's employees shall acknowledge in writing his/her understanding and acceptance of the policy.

2.      Warehouseman shall implement pre-employment background checks (including criminal and driving record) and drug screen.

3.      The Warehouse shall have adequate internal and external lighting and be equipped with appropriate access security measures designed to deter entry by unauthorized personnel.

4.      Warehouseman shall hold annual communications with employees to emphasize intolerance for tampering and intentional or unintentional contamination of materials or products.

5.     Warehouseman shall consider the development and deployment of a "Distribution Center Standard Operating Procedures Manual" to incorporate the above-listed items.



Exhibit "B"

# WAREHOUSE SERVICES AND LICENSE AGREEMENT
## Dependable Companies, Inc., 2555 E Olympic Blvd, Los Angeles, CA  90023

THIS WAREHOUSE SERVICES AND LICENSE AGREEMENT ("Agreement") is made and entered into as of the 1st day of July, 2016 by and between Dependable Companies, Inc., a California corporation ("Warehouseman"), and ANHEUSER-BUSCH, LLC, a Missouri limited liability company ("Depositor").

1. ***Definitions.***  For all purposes of this Agreement, the following terms shall have the following meanings.

     1.1.    "Annual Reporting Period" means a one-year period commencing on the Effective Date or any anniversary of the Effective Date and ending on the day next preceding the next following anniversary of the Effective Date.

     1.2.    "Beverages" means the beverage products from time-to-time manufactured and sold by Depositor or not manufactured by Depositor but sold by Depositor to Wholesaler.

     1.3.    "Bill of Lading" means a non-negotiable bill of lading issued by a common carrier or other shipper which (a) delivers Products, Supplies and/or Returnables to the Premises, or (b) picks up, at the Premises, Products, Supplies and/or Returnables for delivery elsewhere.

     1.4.    "CEW Refrigeration" means (a) the refrigeration equipment installed in those portions of the Warehouse where Products, other than draught beer, are to be stored, and (b) the refrigeration equipment installed in the "cold storage room" portion of the Warehouse where draught beer Products are to be stored.

     1.5.    "CEW Refrigeration Expenses" means the expenses which are incurred in connection with (a) the testing of the CEW Refrigeration, (b) preventative maintenance and routine maintenance of the CEW Refrigeration, and (c) repairs of the CEW Refrigeration.

     1.6.    "Claim" means a claim made against one or more Indemnitees as a result of a matter to which reference is made in Section 16.1 hereof as to which there is indemnification pursuant thereto.

     1.7.    "Commencement Date" means the *day* on which Depositor gives Warehouseman a Notice thereof (now anticipated by the Parties to be on or about July 1, 2016), that construction of such portion of the Improvements has been completed which is necessary to make the Premises suitable for handling and storage of Depositor's Products and Warehouseman does begin to store and handle such products at the Warehouse.

     1.8.    "Computer" means the computer hardware of Depositor, excluding the System Applications, with which the System Applications operates and is linked from time-to-time.

574310

1.9.     "Computer Supplies" means computer paper and other supplies which are necessary in order for Warehouseman properly to use the System Hardware and the System Applications.

1.10.    "Confidential Information" means (a) the terms of this Agreement including, without limitation all exhibits hereto, (b) the quantity and/or type of Products purchased from Depositor by any Wholesaler and all other information regarding other Wholesalers which is deemed to be and/or generally is treated as confidential and/or proprietary by Depositor and/or another Wholesaler, and (c) all other records, materials and information obtained by Warehouseman from Depositor and/or another Wholesaler or which Warehouseman otherwise learns in connection with Warehouseman's performance and provision of Services which are deemed to be and/or generally are treated as confidential and/or proprietary by Depositor and/or another Wholesaler, in each instance unless the information generally is known to the public as a whole other than as a result of an improper act or omission of Warehouseman.

1.11.    "Depositor Licenses" means all federal, state and local licenses and permits, if any, which Depositor is required to procure and all bonds, if any, which Depositor is required to obtain before Depositor legally may perform the obligations which it is to perform under this Agreement on and after the Commencement Date.

1.12.    "Documents" means Bills of Lading, Orders and Warehouse Receipts.

1.13.    "Effective Date" means the date set forth in the first paragraph of this Agreement.

1.14.    "Equal Employment Opportunity Clause" means collectively, the requirements of 41 CFR 60-1.4(a), 41 CFR 60-300.5(a) and 41 CFR 60-741.5(a) and that these laws are incorporated herein by reference.  These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, or national origin.  These regulations require that covered prime contractors and subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.  The parties also agree that, as applicable, they will abide by the requirements of Executive Order 13496 (29 CFR Part 471, Appendix A to Subpart A), relating to the notice of employee rights under federal labor laws.

1.15.    "Equipment" means the equipment which is described on Exhibit A hereto and such additional equipment, if any, which the Parties mutually agree will be purchased or leased, and which is purchased or leased, by Warehouseman for use by Warehouseman in providing Services, as provided for in Section 5.10 hereof.

1.16.    "Excluded Impositions" means (i) real estate taxes which are imposed against and/or in respect of the Premises, (ii) special assessments which are imposed against and/or in respect of the Premises by any applicable governmental authority, and (iii) subdivision assessments which are imposed against and/or in respect of the Premises.

- 2 -

1.17.   "Excluded Repairs and Replacements" means Repairs and Replacements which, for federal income tax purposes, are treated as capital improvements.

1.18.   "Expiration Date" means the last day of the Term (which also is the last day of the License).

1.19.   "Facility Maintenance Contractors" mean (a) independent third-party contractors, and (b) Warehouseman in the event it utilizes its employees to provide the types of Services as to which the Facility Maintenance Fee relates not only at the Premises but also at other places where Warehouseman conducts business, it being understood thereby Warehouseman shall not constitute a Facility Maintenance Contractor regarding any of such Services which are performed or provided by Warehouseman's employees who are dedicated for work solely at the Premises.

1.20.   "Facility Maintenance Fee" means the actual monthly costs for those items as submitted by Warehouseman to Depositor on the monthly basis together for services from Facility Maintenance Contractors required under Section 7.2.2 of the Agreement.

1.21.   "Fees" means Handling Fees and Facility Maintenance Fee, individually and collectively.

1.22.   Intentionally Omitted.

1.23.   "Fiscal Year" means a one-year period which begins on the Commencement Date or on any anniversary of the Commencement Date and ends on the day next preceding the next following anniversary of the Commencement Date.

1.24.   "Handling Fees" means the fees described on Exhibit B hereto, as such Fees may increase or decrease from time-to-time with the mutual agreement of the Parties, which agreement may be evidenced by their agreement on a new Exhibit. B hereto.

1.25.   "Hazardous Material Laws" means all federal, state and local laws, ordinances, rules and regulations which are in effect from time-to-time which relate to the industrial hygiene, environmental protection or the use, analysis, generation, manufacture, storage, presence, disposal or transportation of any Hazardous Material and/or Hazardous Waste or any other contaminated or polluting material, substance or waste which does not constitute a Hazardous Material.

1.26.   "Hazardous Materials" means any "hazardous substances", "hazardous materials" or "toxic substances" as defined under any Hazardous Material Law including, without limitation, (a) gasoline, oil, flammable explosives, asbestos, urea formaldehyde, polychlorinated biphenyls, radioactive materials or other hazardous, toxic, contaminated or polluting materials or substances, and (b) any other material or substance which could subject Depositor or Warehouseman to liability for clean-up or other damages if the material were spilled, released or

- 3 -

disposed of (through storm sewers or otherwise) on or from the Premises, in each instance until such time as the substance or material becomes Hazardous Waste.

1.27.   "Hazardous Waste" means any waste identified as hazardous waste under any Hazardous Material Law, either through listing therein or there under or on the basis of its ignitable, corrosive, reactive and/or toxic characteristics including, without limitation, (a) radioactive waste and other hazardous, toxic, contaminated or polluting waste, and (b) any contaminated or polluting material, substance or waste which does not constitute a Hazardous Material, the disposal of which is governed by any Hazardous Material Law.

1.28.   "Holidays" means midnight to the next following 11:59 P.M., on Thanksgiving Day, Christmas Day and New Year's Day.

1.29.   "Indemnitees" means all entities and persons entitled to indemnification pursuant to Section 16.1 hereof regarding a particular Claim.

1.30.   "Indemnitor" means the Party required to give indemnification pursuant to Section 16.1 hereof regarding a particular Claim.

1.31.   "Initial Term" has the meaning ascribed to that term in Section 3.1 hereof.

1.32.   "Land" has the meaning ascribed to that term and the term Site in the Lease.

1.33.   "License" has the meaning ascribed to that term in Section 4.1 hereof.

1.34.   "Misshipped" or "Misshipment" means a shipment of Products from the Warehouse which, when received by the person or entity intended to receive such Products, does not consist of the Products shown on the Bill of Lading respecting such shipment.

1.35.   "Notice" means a notice provided for in this Agreement.

1.36.   "Normal Working Days" means every day during the Term after the Commencement Date other than Holidays.

1.37.   "Normal Working Hours" means 24 hours each Normal Working Day, in such number of shifts of such duration as Warehouseman reasonably determines appropriate but with due deference given to timely provision of Services encompassed by Section 5.1 hereof.

1.38.   "Operating Cost Report" means a report which (a) itemizes Warehouseman's revenue from Depositor for Services performed and provided by Warehouseman at the Premises and also Warehouseman's operating costs at the Premises, and (b) contains all information called for in Exhibit C hereto, as said Exhibit C hereafter may be revised, amended and/or replaced from time-to-time by Notice thereof given by Depositor to Warehouseman.

- 4 -

1.39.   "Order" means appropriate electronic, via computer, and/or physical documentation from Depositor to Warehouseman which specifies the date and time that an identified quantity of identified Products are to be picked up by or for a Wholesaler at the Premises.

1.40.   "Overage Products" means those Products owned by Depositor that are deemed overage by Depositor.

1.41.   "Parties" means Depositor and Warehouseman.

1.42.   "Premises" means the Land and the Improvements, and each and every portion and part of the Land and Improvements, subject, however, to Section 4.3 hereof.

1.43.   "Products" means Beverages which (a) are shipped by Depositor to the Premises for storage in the Warehouse by Warehouseman for Depositor pursuant to this Agreement, and (b) on occasion may be shipped by a Wholesaler to the Premises for storage in the Warehouse by Warehouseman for that Wholesaler pursuant to this Agreement.

1.44.   "Promotional Material" means glasses, coasters, napkins, signage and other items promoting the sale of Products which are provided by Depositor to Wholesalers and by Wholesalers to their retail customers.

1.45.   "Proposed Fees" has the meaning ascribed to that term in Section 7.9.1 hereof.

1.46.   "Renewal Term" means a one-year period during the Term which commences on the day after the last day of the then current Term.

1.47.   "Repairs and Replacements" means repairs, replacements, maintenance, renewals, alterations, additions and/or betterments to the Premises.

1.48.   "Returnables" means empty pallets and empty Beverage containers which Wholesalers return to the Premises.

1.49.   "Services" means the services which Warehouseman is to provide and perform and the other obligations which Warehouseman is to satisfy pursuant to this Agreement as specifically provided for in this Agreement.

1.50.   "Shipping Supplies" means dunnage, bracing, pallets, and packaging materials which are necessary, suitable and appropriate for Warehouseman to perform and provide Services.

1.51.   "Supplies" means Computer Supplies, Promotional Material and Shipping Supplies.

1.52.   "Sundays" means the calendar days of that name from midnight to the next following 11: 59 P.M. on those calendar days, unless a Holiday.

534605.01
REV 06-18-2015

1.53. "System Applications" means the computer software of Depositor which from time-to-time is used by the Parties to communicate with each other regarding matters encompassed by this Agreement.

1.54. "System Hardware" means the appropriate computer hardware equipment of Depositor which is to be located in the Warehouse pursuant to this Agreement.

1.55. "System Hardware Expenses" means the expenses which are incurred in connection with (a) the testing of the System Hardware, (b) preventative maintenance and routine maintenance of the System Hardware, and (c) repairs of the System Hardware.

1.56. "Term" means the Initial Term and all Renewal Terms, if any, subject, however, to the provisions of Section 18.8 hereof in the event of an early termination of this Agreement pursuant to Section 18 hereof.

1.57. "Training Period" means the period during which all training contemplated by Section 2.4 hereof takes place.

1.58. "UCC" means the Uniform Commercial Code.

1.59. "Warehouse" means the warehouse with the address of 800 East 230th Street, Carson CA 90745 and office portion of the Premises to which reference is made in Section 1.48 hereof.

1.60. "Warehouse Receipt" means appropriate electronic and/or physical documentation generated by Warehouseman confirming receipt of Products, Returnables and/or Supplies at the Premises.

1.61. "Warehouseman Licenses" means all federal, state and local licenses and permits which Warehouseman is required to procure and all bonds which Warehouseman is required to obtain before Warehouseman legally may (a) occupy the Premises, and (b) perform and provide all Services on and after the Commencement Date.

1.62. "Wholesaler" means an entity (a) to which Depositor sells Beverages, and (b) which sells such Beverages to its customers for resale to the general public.

2. *Conditions Precedent.*

2.1. *Depositor Licenses.* Prior to the Commencement Date, Depositor shall procure and obtain all Depositor Licenses at Depositor's sole cost and expense.

2.2. *Warehouseman Licenses And Warehouse Manager Training.* Prior to the Commencement Date, Warehouseman shall (a) obtain all Warehouseman Licenses at Warehouseman's sole cost and expense, (b) cause its employee who is to be its warehouse manager at the Premises to complete, other than at the Premises, all training which is required in order for

- 6 -

that employee properly to perform and discharge all duties and responsibilities which are required of such employee in that capacity, and (c) purchase or lease all Equipment, which shall be new rather than used, and cause all such Equipment to be at the Premises and ready for use. Prior to the Commencement Date, Warehouseman shall advise Depositor as and when Warehouseman unconditionally contracts to purchase or lease the Equipment and, at the same time or promptly thereafter, provide Depositor with a copy of the transaction documents regarding such Equipment.

2.3. *General Employee Training.* For approximately four weeks commencing on or shortly after the Commencement Date, Warehouseman shall cause (a) Warehouse operator employees of Warehouseman adequate to operate the Premises who are to perform and provide Services on Warehouseman's behalf at the Premises to complete, at the Premises, all training which is required in order for those employees properly to perform and discharge all duties and responsibilities which are required of such employees in those capacities, and (b) the warehouse manager who receives training pursuant to Section 2.2 hereof to participate in the training contemplated by this Section 2.3.

2.4. *Cost Of Training.* The training provided for in Section 2.2 and Section 2.3 hereof shall be at the sole cost and expense of Warehouseman. Depositor shall not be required to pay for, or reimburse Warehouseman for, any costs of or associated with any training contemplated by this Agreement (other than as may be incorporated as part of Exhibit B or other fees specifically set forth in this Agreement).

2.5. *Caliber Of Warehouseman's Employees.* In all events and under all circumstances, Warehouseman only shall permit qualified and properly trained employees to perform any Services on Warehouseman's behalf. Without limiting the generality of the foregoing, in all events and under all circumstances Warehouseman shall be solely responsible for insuring that all of its employees who perform any Services on Warehouseman's behalf are properly trained in order for them properly to perform and discharge all duties and responsibilities which are required of such employees in order for all Services properly and timely to be performed and provided, which shall be at the sole cost and expense of Warehouseman.

2.6. *Additional Training.* Without limiting the generality of Section 2.4 hereof, Warehouseman shall be solely responsible for paying all costs and expenses associated with the training of its employees in the event its Warehouse manager, any of its Warehouse operator employees and/or its clerical employee who receive any training pursuant to, as applicable, Section 2.2 and Section 2.3 hereof, do not complete such training or leave the employ of Warehouseman at the Premises during the Term.

3. *Term.*

3.1. *Initial Term.* The Initial Term of this Agreement shall be from the Effective Date to the day next preceding the first anniversary of the Commencement Date.

3.2. *Renewal Terms.* After the Initial Term, the Term automatically shall renew for two (2) successive Renewal Terms of one (1) year each, unless either of the Parties gives Notice to the contrary to the other Party at least ninety (90) days prior to the last day of, as applicable, the

Initial Term or the then current Renewal Term and, if such a Notice is given, the Term shall end on the last day of, as applicable, the Initial Term or the then current Renewal Term.

       3.3.    *Early Termination.*  In all events and under all circumstances, the foregoing provisions of this Section 3 shall be subject to the provisions of Section 18 hereof and provisions of this Agreement referenced therein regarding an early termination of this Agreement.

    **4.  *License To Use Premises.***

       4.1.    *Grant Of License.*  Depositor hereby grants to Warehouseman a nonexclusive License to enter into and utilize the Premises solely for the purposes and subject to all of the terms and conditions set forth in this Agreement.  Such License and resulting right of use shall not be deemed an interest in real estate.  Subject to such expressed right of Warehouseman, nothing set forth below in this Section 4 or elsewhere in this Agreement shall constitute, or be deemed or construed to constitute, a limitation or restriction on any right, express or implied, of Depositor which results from the License being non-exclusive.

       4.2.    *Term Of License.*  The term of the License shall begin on the Commencement Date and shall end on the last day of the Term (namely, the Expiration Date).

       4.3.    *Changes In Dedicated Warehouse Space.*  In the event, from time-to-time during the Term, Depositor determines that Warehouseman reasonably may perform and provide Services related to the storage and handling of Products without using the entire Warehouse therefore, then Depositor shall have the right, by Notice to Warehouseman, to cause such portion of the Warehouse, to which reference shall be made in such Notice, to cease to constitute a portion of the Premises provided Warehouseman reasonably may perform and provide all such Services in the remainder of the Warehouse. Likewise, Depositor shall have the right from time-to-time, by Notice to Warehouseman, to cause some or all of such portion, to which reference shall be made in such Notice, again to constitute a part of the Premises.

       4.4.    *Improvements To Accommodate Changes In Dedicated Warehouse Space.*  In the event Depositor elects, pursuant to Section 4.3 hereof, to cause a portion of the Warehouse to cease to constitute a portion of the Premises, Depositor shall be required, at its sole cost and expense, to make such improvements to the Warehouse as reasonably are required in order to cause the remaining portion of the Warehouse physically to be separated and secure from the portion of the Warehouse which no longer is to constitute a part of the Premises.  Likewise, in the event Depositor elects, pursuant to Section 4.3 hereof, to cause some or all of such portion of the Warehouse again to constitute a part of the Premises, Depositor shall be required, at its sole cost and expense, to remove the improvements to which references are made above in this Section 4.4 so that such portion, which again is to constitute a part of the Premises, reasonably may be used by Warehouseman together with the remainder of the Warehouse.

       4.5.    *General License Conditions And Obligations.*  During the term of the License:

4.5.1.    Warehouseman shall not use or occupy the Premises, or permit the Premises to be used or occupied, in a manner (a) contrary to any statute, rule, order, ordinance, requirement or regulation applicable to the Premises, or (b) which would violate any certificate of occupancy affecting the same, or (c) which would make void or voidable any insurance carried by Warehouseman or Depositor or which otherwise is required to be carried by Warehouseman under this Agreement and is then in force, or (d) which would make it impossible to obtain fire or other insurance respecting the Premises maintained by Depositor or required to be furnished hereunder by Warehouseman, or (e) which would cause structural injury to any of the Improvements or cause the value or usefulness of the Premises substantially to diminish (reasonable wear and tear excepted), or (f) which would constitute a public or private nuisance or waste.  Warehouseman, upon discovery of any such use, promptly shall take all necessary steps to discontinue and compel the discontinuance of such use.

4.5.2.    Warehouseman shall not use or allow to be utilized at the Premises any chemicals or fumes which would cause depreciation of any portion of the Premises to accelerate over what would occur if there was normal storage of inert products at the Premises.

4.5.3.    Warehouseman, at its sole cost and expense, shall take good care of the Premises and shall keep the same in good order and condition; Warehouseman, at its sole cost and expense, shall make and perform all Repairs and Replacements of and to the Premises including, without limitation, routine maintenance of the Premises and all necessary repairs thereto, interior and exterior, ordinary and extraordinary, foreseen and unforeseen, of every nature, kind and description.  All Repairs and Replacements made by Warehouseman shall be at least equal in quality to the original work and shall be made by Warehouseman in accordance with all laws, ordinances and regulations, whether heretofore or hereafter enacted.  The necessity for or adequacy of Repairs and Replacements shall be measured by the standards which are appropriate for Improvements of similar construction and class, provided that Warehouseman shall in all events make all Repairs and Replacements necessary to avoid any structural damage or other damage or injury to the Premises.

4.5.4.    Warehouseman, at its sole cost and expense, shall (a) take good care of, and shall effect Repairs and Replacements of and to, all driveways, pathways, roadways, sidewalks, curbs, railroad tracks (if any), parking areas, loading areas, landscaped areas, entrances and passageways on or appurtenant to the Premises in order for the same to remain in good order and repair, and (b) promptly remove all accumulated snow, ice and debris from any and all driveways, pathways, roadways, sidewalks, curbs, parking areas, loading areas, entrances and passageways, and keep the Premises, including the sidewalks, curbs, roadways, alleys, entrances or railroad tracks, if any, in a clean and orderly condition free of snow, ice, dirt, rubbish, debris and unlawful obstructions.

4.5.5.    Warehouseman shall not (a) do or suffer any waste or damage, disfigurement or injury to the Premises or to the fixtures or equipment in and about the Premises, or (b) permit or suffer any overloading of the floors or other use of any such Improvement that would place an undue stress on the same or any portion thereof beyond that for which the same was designed.

- 9 -

4.5.6.    Subject to the further provisions of this Section 4.5.7, Warehouseman, at its sole cost and expense, promptly shall comply or cause compliance with, or remove or cure or cause to be removed or cured, any violation of any and all present and future (a) laws, ordinances, orders, rules, regulations and requirements of all federal, state, municipal and other governmental bodies having jurisdiction over the Premises and the appropriate departments, commissions, boards and officers thereof, and (b) orders, rules and regulations of the Board of Fire Underwriters where the Premises are situated or any other body now or hereafter constituted which exercises lawful or valid authority over the Premises or the sidewalks, curbs, roadways, alleys, entrances or railroad track facilities, if any, or exercises authority with respect to the use or manner of use of the Premises, or such adjacent or appurtenant facilities, in each instance whether the compliance, curing or removal of any such violation and the costs and expenses necessitated thereby shall have been foreseen or unforeseen, ordinary or extraordinary, and whether or not the same shall be presently within the contemplation of Depositor or Warehouseman or shall involve any change of governmental policy or require structural or extraordinary repairs, alterations or additions by Warehouseman and irrespective of the costs thereof.

4.5.7.    Warehouseman shall not suffer or permit any mechanic's lien or other lien to be filed against the Premises by reason of work, labor, skill, services, equipment or materials supplied or claimed to have been supplied to the Premises at the request of Warehouseman, or anyone holding the Premises through or under Warehouseman.  If any such mechanic's lien or other lien shall at any time be filed against the Premises, Warehouseman shall cause the same to be discharged of record within thirty (30) days after the date of filing the same. If Warehouseman shall fail to discharge such mechanic's lien or liens or other lien within such period, then, in addition to any other right or remedy of Depositor, Depositor may, but shall not be obligated to, discharge the same by paying to the claimant the amount claimed to be due or by procuring the discharge of such lien as to the Premises by deposit in the court having jurisdiction of such lien, the foreclosure thereof or other proceedings with respect thereto, of a cash sum sufficient to secure the discharge of the same, or by the deposit of a bond or other security with such court sufficient in form, content and amount to procure the discharge of such lien, or in such other manner as is now or may in the future be provided by present or future law for the discharge of such lien as a lien against the Premises.  Any amount paid by Depositor, or the value of any deposit so made by Depositor, together with all costs, fees and expenses in connection therewith (including reasonable attorney's fees, costs and expenses of Depositor), together with interest thereon at the rate of ten percent (10%) per annum, shall be repaid by Warehouseman to Depositor on demand by Depositor. Independent of Section 16 hereof, Warehouseman shall indemnify and defend Depositor against and save Depositor and the Premises harmless from all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including, without limitation, reasonable attorney's fees resulting from the assertion, filing, foreclosure or other legal proceedings with respect to any such mechanic's lien or other lien.

4.5.8.    Warehouseman shall not bring any Hazardous Material or any Hazardous Waste onto the Premises or, under its authority, allow any Hazardous Material or any Hazardous Waste to be brought onto or in the Premises.  Notwithstanding the foregoing as to Hazardous Materials, but subject to the conditions that in no event (a) may any Hazardous Material be used at the Premises in any industrial process carried on at the Premises, or (b) may Warehouseman install or allow to be installed at the Premises any tank or other fixture for the

- 10 -

storage of any Hazardous Material, Warehouseman shall be entitled to use and/or generate, at the Premises, Hazardous Materials of the type and quantities ordinarily used or generated in connection with the conduct of a warehousing operation of the type to be conducted by Warehouseman pursuant to this Agreement but, in connection therewith, Warehouseman shall insure that all such Hazardous Materials are used, stored, generated and labeled in strict compliance with all applicable Hazardous Material Laws and, without limiting the generality of Section 4.5.12 below, disposed of in strict compliance with all applicable Hazardous Material Laws as such time as the Hazardous Materials become Hazardous Waste. Nothing set forth below in this Section 4.5 or elsewhere in this Agreement shall constitute, or be deemed or construed to constitute, a waiver by Depositor of any of the prohibitions or restrictions set forth above in this Section 4.5.10.

4.5.9. Warehouseman shall at all times and in all respects comply with (a) all Hazardous Material Laws, and (b) to the extent more restrictive, prudent industry practices, in each instance which relate to or regard the industrial hygiene, environmental protection and/or handling, treatment, use, analysis, management, generation, manufacture, storage, presence, disposal and/or transportation of any Hazardous Material or any Hazardous Waste onto, in, about and from the Premises. Without limiting the generality of the foregoing, all labeling and reporting obligations imposed by any Hazardous Material Law are solely the responsibility of Warehouseman.

4.5.10. Without limiting the generality of Section 2.2 hereof, Warehouseman shall, at its sole cost and own expense, procure, maintain in effect and comply with all conditions of any and all permits, licenses and other governmental and regulatory approvals required for Warehouseman's use of the Premises, including, without limitation, (a) discharge of materials or waste into or through any sanitary sewer system serving the Premises, and (b) the use and generation at the Premises of Hazardous Materials to the extent such use and generation specifically are permitted under Section 4.5.10 hereof. Except as discharged into the sanitary sewer in strict accordance and conformity with all applicable Hazardous Material Laws, during the term of the License Warehouseman shall cause any and all Hazardous Materials which Warehouseman desires to be removed from the Premises or which, under any Hazardous Material Law, Warehouseman is required to remove from the Premises, and also all Hazardous Waste which is removed from the Premises, to be removed from the Premises and transported for use, storage, treatment or disposal in accordance with and in complete compliance with all applicable Hazardous Material Laws.

4.5.11. Except under circumstances requiring immediate action to minimize contamination, Warehouseman shall not at any time take any remedial action in response to the presence of any Hazardous Material or any Hazardous Waste in, on, about or under the Premises including, without limitation, the Warehouse and any other Improvement, nor enter into any settlement agreement, consent decree or other compromise in respect to any claims relating to any Hazardous Material or Hazardous Waste in any way connected with the Premises including, without limitation, the Warehouse or any other Improvement, in each instance without first notifying Depositor of Warehouseman's intention to do so and affording Depositor ample opportunity to appear, intervene or otherwise appropriately assert and protect Depositor's interest with respect thereto.

- 11 -

4.5.12.   If, at any time, Depositor has evidence that would lead a reasonable person to believe that any unauthorized Hazardous Material or Hazardous Waste may exist on or in respect to the Premises, or that any Hazardous Material or Hazardous Waste may have been spilled or disposed of or treated or handled in violation of any of the foregoing provisions of this Section 4.5, Depositor shall have the right to require Warehouseman to undertake and submit to Depositor (a) an environmental audit from an environmental company reasonably acceptable to Depositor, in order to determine Warehouseman's compliance with all applicable provisions of this Section 4.5, and/or (b) an environmental assessment of the Premises. Depositor may, at its expense, commission an environmental audit of Warehouseman or an environmental assessment of the Premises at any time after written notice thereof is given to Warehouseman.

4.5.13.   The obligations of Warehouseman which are set forth above in this Section 4.5 regarding (a) Hazardous Materials are limited to Hazardous Materials brought onto and/or generated at the Premises by or at the direction of Warehouseman, its agents, employees, invitees, subcontractors and others acting under Warehouseman's authority or with Warehouseman's approval, and (b) Hazardous Waste is limited to Hazardous Waste generated or otherwise existing at the Premises by or at the direction of Warehouseman, its agents, employees, invitees, subcontractors and others acting under Warehouseman's authority or with Warehouseman's approval.  For purposes of this Section 4.5.16, (c) entities which are granted a license or other right by Depositor to use a portion of the Warehouse which is excluded from the Premises under Section 4.3 hereof shall not be deemed to be acting under Warehouseman's authority or with Warehouseman's approval merely because of Warehouseman's agreement to Section 4.3 hereof, and (d) others granted the right by Depositor to come onto the Premises as contemplated by Section 4.9 hereof shall not be deemed to be acting under Warehouseman's authority or with Warehouseman's approval merely because of Warehouseman's agreement to Section 4.9 hereof.

4.5.14.   Intentionally Omitted.

4.5.15.   Without limiting the generality of any of the foregoing provisions of this Section 4.5, Warehouseman shall not commit or suffer any act or omission that would, or with the passage of time could, cause a violation or invalidation of all or any portion of any warranty or guarantee with respect to the Premises including, without limitation, the Warehouse or any other Improvement or any component thereof or installation thereon or therein, including, without limitation, any equipment, whether plumbing, electrical or mechanical including, without limitation, the CEW Refrigeration.

4.5.16.   Depositor shall have the right to erect signs on the interior and exterior of the Warehouse and at such other locations at the Premises as Depositor may desire.

4.5.17.   Without limiting the generality of any of the foregoing provisions of this Section 4.5 or of Section 16.1 below, Warehouseman timely shall pay and otherwise satisfy all Fines, Penalties, Interest and Costs.

- 12 -

4.6.    *Notice To Contractors.*   Warehouseman shall notify all materialmen, contractors, artisans, mechanics, laborers and any other person now or hereafter furnishing any labor, services, materials, supplies or equipment to Warehouseman with respect to the Premises that they must look exclusively to Warehouseman to obtain payment for the same; that Depositor shall not be liable for any labor, services, materials, supplies, skill, machinery, fixture or equipment furnished or to be furnished to Warehouseman upon credit.

4.7.    *Use Of Contract Carriers.*  Depositor shall have the right to grant to others the right to come onto the Premises when the activities of such others at the Premises are ancillary to the services which Warehouseman is to provide pursuant to Section 5.1 hereof.  In the foregoing regard, but without limiting the generality of the foregoing, Warehouseman acknowledges that (a) Products, Supplies, Returnables and Shipping Supplies are to be shipped or transported to and from the Premises via common carriers, and (b) Depositor may contract with one or more common carriers to transport Products to Wholesalers from the Premises and it may be necessary for such contract carriers to, among other things, not only come onto the Premises but also store their trailers and/or trucks at the Premises in order to provide such transport service in a timely and otherwise appropriate manner.

5.   **General  Duties  Of  Warehouseman.**    During  the  Term  from  and  after  the Commencement Date:

5.1.    *Product Services.*  Warehouseman shall provide to Depositor all services related to or otherwise in connection with the receipt, storage, loading and unloading of Products, Supplies and Returnables including, without limitation, the following:

5.1.1.    Warehouseman shall receive and place in storage in the Warehouse all of the (a) Products, Supplies and Returnables which Depositor may, in its sole and absolute discretion, have shipped or transported or caused to have been shipped or transported to the Premises for Depositor's account, and (b) Products and Returnables which are returned by a Wholesaler to Depositor at the Warehouse.   Warehouseman shall deliver to Depositor, simultaneously with each receipt of such Products, Supplies and Returnables, Warehouseman's nonnegotiable Warehouse Receipt therefore. In the event of any conflict between the terms of any such Warehouse Receipt and the terms of this Agreement, the terms of this Agreement shall govern.    No Products, Supplies or Returnables shipped to the Premises shall be for Warehouseman's account.

5.1.2.    Upon receipt of written or electronically communicated Order from Depositor, Warehouseman shall, in accordance with such Order, remove designated Products from storage and handle and load same in its original packaging (or as repackaged pursuant to Section 5.1.5 hereof) into designated trucks, trailers or other carriers for shipment or delivery to such persons or entities as Depositor may direct, including distributors of the Products (namely, Wholesalers).  It shall be the responsibility of Warehouseman (i) to inspect each vehicle before Products are loaded thereon and to sweep the vehicle if necessary or appropriate, and (ii) to restack Product being unloaded from a vehicle to the extent such restacking is necessary or appropriate. Handling Fees will be appropriately adjusted to the extent necessary if the costs for Warehouseman to effect (i) and/or (ii) exceed the assumptions in Exhibit B hereto.  The Handling Fees are based

- 13 -

on Depositor's estimate that six percent (6%) or less of the outbound shipments will be in loose case handling (i.e., not correctly configured units). If, after six (6) months of operations, Warehouseman reasonably determines, based on the most recent three (3) months of experience, that the estimate of six percent (6%) has been exceeded, the Parties agree to renegotiate the Handling Fees.

5.1.3.    Warehouseman shall load for shipment from the Premises the oldest Products first, in accordance with Depositor's instructions, contemplated to be communicated via the Computer, and shall otherwise handle the Products in and about the Warehouse in accordance with Depositor's instructions. The foregoing shall apply with equal force and effect to Products shipped by Depositor to the Premises and Products shipped by a Wholesaler to the Premises.

5.1.4.    Warehouseman shall receive and store all Returnables (whether or not correctly configured) for shipment to such destinations as Depositor may direct.

5.1.5.    When, and as often as, so instructed by Depositor, Warehouseman shall dispose of Overage Products and excess or damaged Products in accordance with Depositor's instructions and, also in accordance with Depositor's instructions, Warehouseman shall repackage damaged and undamaged Products for disposition in such manner as Depositor determines appropriate.

5.1.6.    Warehouseman shall receive, prepare and transmit all shipping papers and other Documents relating to Warehouseman's receipt, storage and shipment of Products, Supplies and Returnables. Copies of all such shipping papers and other Documents shall be provided to Depositor at such times as Depositor may request. Warehouseman shall comply with such instructions as Depositor may give regarding documentation of the Products, Supplies and/or Returnables in the Warehouse, including overnight reports. Warehouseman shall not, without Depositor's prior written approval, prepare or send any bills, invoices or other statements to any person or entity other than Depositor.

5.1.7.    In accordance with Depositor's instructions, Warehouseman shall (a) furnish trained personnel to operate the System Hardware and the System Applications to document the receipt, storage and shipment of Products, Supplies, Returnables and Shipping Supplies at, in and from the Premises and for such other purposes with respect thereto as Depositor may from time to time reasonably request, and (b) notify Depositor immediately by telephone of any malfunction or maintenance problem with respect to the System Hardware and/or the System Applications.

5.1.8.    Warehouseman shall, at such times as Depositor may request, take physical inventories of and prepare bookkeeping records and written receipts with respect to all or designated Products, Supplies and Returnables at the Premises, and shall provide the results of such inventories to Depositor, except that, without such a request, Warehouseman shall take a physical inventory of all Products, Supplies and Returnables at the Premises once each month, on or about the same day of each month, and promptly thereafter provide the results of such inventory to Depositor. Except as to such monthly physical inventories, Depositor shall reimburse

- 14 -

Warehouseman for the direct actual costs to Warehouseman of all physical inventories which Warehouseman takes at Depositor's request.

5.2. *When Product Services Performed.* Warehouseman shall provide the Services encompassed by Section 5.1 hereof continuously during all Normal Working Hours on all Normal Working Days (including legal holidays which do not constitute Holidays), and also on such Holidays as Depositor may require. In the event Depositor requires Warehouseman to perform and provide such Services on a Holiday, then the additional cost to Depositor therefor shall be as set forth on Exhibit B hereto only in the event, and then only to the extent, such Services which are required on the Holiday do not result from a failure of Warehouseman to have had an adequate and experienced work force to perform those Services during prior Normal Working Hours on prior Normal Working Days. Depositor acknowledges that, when Warehouseman is required to perform and provide those Services on Holidays, at least two employees will be required to perform and provide those Services and such employees will be guaranteed no less than six (6) hours each of work on those days.

5.3. *Premises Services.* Without limiting the generality of Section 4.5.4 and Section 4.5.5 hereof, but subject to the provisions thereof, Warehouseman shall provide, as Services, all services related to or otherwise in connection with the Premises in order to maintain the entirety of the Premises in a clean, safe, secure, presentable condition and otherwise to discharge all of Depositor's obligations under the Lease which relate to the Premises. Certain of such Services are identified on Attachment V hereto, which also identifies Warehouseman's estimated cost, beginning on the Commencement Date, for performing all Services contemplated by this Section 5.3, it being understood thereby that the absence of a line item for certain of such Services shall not limit Warehouseman's obligation to provide those Services.

5.4. *Inspection And Maintenance Of CEW Refrigeration, System Hardware and Equipment.* Without limiting the generality of the provisions of Section 5.1 and Section 5.3 hereof, Warehouseman shall (a) cause the CEW Refrigeration, the System Hardware and the Equipment to be inspected at appropriate intervals, (b) cause appropriate preventative maintenance to be performed on the CEW Refrigeration, the System Hardware and the Equipment, and (c) maintain or cause the CEW Refrigeration, the System Hardware and the Equipment to be maintained in good working order and repair and, towards that end, make or cause to be made all repairs which are required to the CEW Refrigeration, the System Hardware and the Equipment. Notwithstanding the foregoing, in all events and under all circumstances Warehouseman shall consult with Depositor and its designees from time-to-time regarding the inspection, preventative maintenance and repairs of and to the System Hardware and shall utilize Depositor's designees from time-to-time as to those tasks as and when requested by Depositor.

5.5. *Preservation And Maintenance Of Products.* Warehouseman shall preserve and maintain the Products in as good condition as when received from Depositor. Warehouseman shall promptly handle and load the Products in carriers designated by the Depositor for return of the Products to Depositor in such condition whenever requested by Depositor, or upon the expiration, or earlier termination, of this Agreement for any reason, if so requested by Depositor.

- 15 -

5.6.   *Compatible Work Force; Necessary Equipment and Supplies.* Warehouseman shall furnish (a) a compatible labor force which, irrespective of any change in such work force, continues to be compatible with Depositor's labor force, (b) transportation within the Warehouse, and (c) Warehouse equipment and supplies including, without limitation, the Equipment, as may be necessary to provide all Services subject, however, to Section 6.3 hereof.

5.7.   *Inspection Of Products And Premises; Depositor's Employees At Premises.* It is understood and agreed by Warehouseman that Depositor, its agents or such other persons as Depositor may authorize, shall have the right to at all times and from time-to-time inspect the Products at the Premises, monitor the performance of Services to provide instructions to Warehouseman as contemplated by Section 5.1 hereof and to alone occupy a secured office in the Warehouse for such purposes and related purposes.   In the foregoing regard, Depositor now contemplates that it may cause three of its employees to work at the Premises on a full-time basis for such purposes, but the number of such employees may change from time-to-time as Depositor determines appropriate. Depositor shall have no obligation to use any or all of Warehouseman's Services except with respect to the handling and storage of the Products at the Premises; provided, however, that except in the case of an emergency situation requiring use of the personnel of others, the personnel services performed at the Premises must be performed by Warehouseman's personnel and not by anyone else.

5.8.   *Time For Performance Of Services; Delivery Schedules.*   A reasonable time shall be given Warehouseman to carry out Depositor's instructions and due allowance shall be made for force majeure and events beyond the control of Warehouseman.  Similarly, there will be heavy delivery schedules from the Premises.  In order to provide prompt handling of Products, Supplies and/or Returnables to and from the Premises, Warehouseman will provide appropriate crews.  If the switches are delayed or fail to arrive, Warehouseman will attempt to employ such crews at other work times.

5.9.   *Warehouseman's Due Care; Shrinkage Allowance.*  Warehouseman and its employees shall comply at all times with the policies set forth in Exhibit D attached hereto and made a part hereof.  Warehouseman shall use due care with respect to the Products, Supplies and Returnables and shall not be responsible for any loss or damage to the Products, Supplies and/or Returnables unless such loss or damage (a) results from the failure of Warehouseman, its agents, employees or contractors to use due care or to comply with the policies set forth in Exhibit D, or (b) is covered by any of the insurance described in Section 15.1 hereof, in each such instance subject to Section 15.8 hereof to the extent applicable; provided, however, that Warehouseman shall bear the burden of proof for any unexplained loss of Products, Supplies and Returnables to establish that such loss was not caused by Warehouseman's failure to exercise due care with respect to Products, Supplies and Returnables subject, however, to the following:

5.9.1.   Warehouseman shall have a monthly Product shrinkage allowance for any unexplained loss of Products, the nature of which loss is not covered by any of the insurance described in Section 15.1 hereof.   Such shrinkage allowance shall not exceed Two Tenths of One Percent (2/10 of 1%) of the average monthly floor inventory of Products in the Warehouse during the previous twelve (12) month period, except that the shrinkage allowance in respect of the first twelve (12) months of the Term shall equal the average monthly floor inventory

- 16 -

of Products in the Warehouse during such twelve (12) month period. At the end of such first twelve (12) month period, and thereafter at such times as Depositor determines that a reconciliation is appropriate, Warehouseman shall pay Depositor for all Product shrinkage in excess of such allowance at the then landed cost for the Products to a Wholesaler. Notwithstanding the foregoing, at the end of such first twelve (12) month period and thereafter at the time of each successive reconciliation, Product overages, if any, prospectively shall be credited against Product shrinkage in order to determine the net Product shrinkage for which Warehouseman shall be liable to Depositor in accordance with the foregoing.

   5.9.2. Warehouseman shall be liable to and shall pay Depositor for all lost and/or damaged Supplies at a commercially reasonable charge therefor and shall be liable to and pay Depositor for all lost and/or damaged Returnables at a commercially reasonable charge therefore to the extent such loss or damage results from the failure of Warehouseman, its employees, agents and/or contractors to exercise due care.

   5.9.3. Depositor shall be entitled to offset against Handling Fees Two Hundred Fifty and No/100ths Dollars ($250.00) for each Order that has been Misshipped.

   5.9.4. As used herein, any loss or damage to the Products, Supplies and/or Returnables shall, with respect to Products, be equal to the value of the landed cost thereof, and, with respect to Returnables and Supplies, be equal to the value of the replacement cost thereof.

   5.10. *Acquisition of Additional Equipment.* The Parties shall revise or supplement Exhibit A hereto to reflect all Equipment, if any, in addition to the Equipment described thereon, which the Parties may from time-to-time mutually agree is necessary and/or beneficial to the Parties in the performance and provision of Services, by Depositor, which are related to or otherwise in connection with the receipt, storage, loading and unloading of Products, Supplies and Returnables, the cost of which equipment is to be paid by Warehouseman and recouped by it from Handling Fees. Thereafter, Warehouseman shall advise Depositor as and when Warehouseman unconditionally contracts to purchase or lease such additional Equipment and, at that time or promptly thereafter, provide Depositor with a copy of the transaction documents regarding such additional Equipment.

   5.11. *Legal Liability Insurance Claims.*

   5.11.1. With reasonable promptness after Warehouseman becomes aware of any loss of or injury to any Products, Supplies and/or Returnables which is covered by the insurance described in Section 15.1.3 hereof, and in no event later than sixty (60) days after the Warehouseman becomes aware of the loss or injury, Warehouseman shall give Depositor a Notice thereof which describes the nature and extent of the loss or injury with reasonable particularity.

   5.11.2. With reasonable promptness after Depositor is notified by any Wholesaler of any loss of or injury to any Products which is covered by the insurance described in Section 15.1.3 hereof, and in no event later than sixty (60) days after the day on which Depositor receives such a notification, Depositor shall advise Warehouseman of the nature and extent of the loss or injury to the extent actually known by Depositor, except that Depositor shall be excused

- 17 -

from giving such advice to Warehouseman if, within the aforesaid period during which Depositor was to give such advice to Warehouseman, Warehouseman is advised of the loss or injury by the affected Wholesaler or someone other than Depositor.

        5.11.3. Without limiting the generality of Section 15.7 hereof, Warehouseman timely shall (a) present, to the issuer of the insurance described in Section 15.1.3 hereof, all claims for all losses of and injuries to any Products, Supplies and/or Returnables which are covered by such insurance, and (b) institute a legal action against the issuer of such insurance in the event the claim is not satisfied by such insurer before expiration of the period during which such legal action must be instituted.

### 6. *General Rights And Duties Of Depositor.*

        6.1. *Product Quantity From Depositor*. There shall be no minimum or maximum quantity of Products which Depositor is required or permitted to ship to the Premises during the Term initially for storage in the Warehouse pursuant to this Agreement; provided, however, (a) Warehouseman shall not be required to accept delivery from Depositor of that quantity of Products if, at the time of delivery, the Warehouse properly cannot accommodate that quantity, and (b) Depositor shall be liable for all demurrage charges which result from the inability of Warehouseman to accept delivery of Products because of such inability of accommodation.

        6.2. *Product And Returnable Quantities From Wholesalers*. There shall be no minimum or maximum quantity of Products or Returnables which a Wholesaler is required or permitted to ship to the Premises during the Term initially for storage in the Warehouse pursuant to this Agreement; provided, however, (a) Warehouseman shall not be required to accept delivery from a Wholesaler of that quantity of Products or Returnables if, at the time of delivery, the Warehouse properly cannot accommodate that quantity, and (b) Depositor shall be liable for all demurrage charges which results from the inability of Warehouseman to accept delivery of Products because of such inability of accommodation.

        6.3. *Computer Supplies And Computer Services*. Subject to Section 6.4 hereof, Depositor shall from time-to-time during the Term provide Warehouseman with, or if determined appropriate by Depositor, reimburse Warehouseman for the cost to Warehouseman of, a sufficient quantity of Computer Supplies and Shipping Supplies for use by Warehouseman in connection with Warehouseman's performance and provision of Services, and Warehouseman only shall use those Supplies for such purpose.

        6.4. *Monitoring Levels Of Computer Supplies And Shipping Supplies*. Warehouseman continually shall monitor the level of all Computer Supplies and Shipping Supplies at the Premises and from time-to-time during the Term shall advise Depositor as and when the quantity of particular Computer Supplies and Shipping Supplies, respectively, on hand at the Premises is reaching a level that requires the shipment of additional Computer Supplies and/or Shipping Supplies by Depositor to Warehouseman at the Premises in order for there to be no delay in the performance and providing of Services by Warehouseman.

- 18 -

6.5.   *Shipment Of Hazardous Materials To Premises.*  Depositor shall (a) not ship any Hazardous Materials (except for normal chemicals used in an office/warehouse such as copier toner and cleaning supplies and materials kept in legal and proper containers) to the Premises during the Term, and (b) instruct its Wholesalers not to ship any Hazardous Materials to the Premises during the Term, and Warehouseman shall not accept at the Premises any Hazardous Materials which a Wholesaler may attempt to ship to the Premises.

6.6.   *Removals By Depositor.*  At any time and from time-to-time during the Term and after expiration of the Term for any reason, Depositor may remove such quantity, variety and type of Products, Supplies and/or Returnables from the Premises as Depositor determines appropriate in its sole and absolute discretion, in which event Warehouseman shall load such items on carriers of or for Depositor and otherwise provide all Services which are required in order to permit such removal which takes place during the Term, it being understood thereby that Depositor shall have the right to affect such removal if, for any reason, Warehouseman timely does not provide those services.  At any time and from time-to-time during the Term and after expiration of the Term for any reason, Depositor also may remove any or all System Hardware and/or other property of Depositor from the Premises as Depositor determines appropriate in its sole and absolute discretion, in which event Warehouseman shall assist Depositor in affecting such removal which takes place during the Term.

7.   *Fees.*

7.1.   *Cost Of Providing Services.*  Except to the extent specifically provided to the contrary in this Agreement, or as otherwise may be agreed to in writing by the Parties from time-to-time, all Services shall be provided and performed by Warehouseman at its sole cost and expense, irrespective of whether such qualifier is mentioned in connection with a particular Service.  Without limiting the generality of the foregoing, the following provisions of this Section 7 set forth all current and reasonably anticipated obligations of Depositor to Warehouseman for all Services.

7.2.   *Handling Fees.*  Depositor shall pay Warehouseman the Handling Fees both variable and fixed in respect of the Services identified on Exhibit B hereto, in accordance with Exhibit B hereto, which are performed and provided by Warehouseman after successful completion of the Training Period.  Without limiting the generality of Exhibit B hereto, Depositor shall not be liable to Warehouseman for any additional fees, costs or expenses incurred by Warehouseman in connection with, by way of examples only, the (a) handling of any Beverages, Supplies and/or Returnables on Saturday, (b) the handling of any Beverages, Supplies and/or Returnables within the Warehouse, (c) the handling of any Beverages, Supplies and/or Returnables in connection with the shipment of the same from the Premises, (d) the repackaging of Products other than when instructed by Depositor, or (e) the repackaging of Products other than undamaged Products for the purpose of shipment of the repackaged Products from the Premises to a Wholesaler, it being understood that the per-unit fees set forth on Exhibit B hereto also provide Warehouseman with adequate compensation for all of such Services.

7.3.   *Interruptions In Shipment Of Products To Premises.*  Notwithstanding Section 7.3 hereof, in the event Depositor is unable or has no need to ship Products to the Premises

- 19 -

because of, without limitation, (a) a suspension or loss of any Depositor License, (b) a strike against Depositor or any affiliate of Depositor or a strike which otherwise affects Depositor's ability to ship Products to the Premises, (c) a strike against any Wholesaler or a strike which otherwise affects the ability of a Wholesaler to take delivery of Products at the Premises, and/or (d) any other affirmative action or inaction of Depositor not otherwise provided for in this Agreement, then and in any such event Depositor shall pay Warehouseman the Facility Maintenance Fee and Depositor shall reimburse Warehouseman for the actual cost to Warehouseman for basic utilities, continuing security and a full staff for a period of one (1) week and a skeleton crew thereafter, which shall be in lieu of Depositor's obligations to Warehouseman under Section 7.3 hereof until such time as the first of the following events occurs, namely (i) the event which gives rise to such a condition no longer exists, (ii) the natural expiration of the Term, and (iii) this Agreement is terminated pursuant to Section 18 hereof.

7.4.    *Fees After Expiration Date*.   No Fees shall be payable by Depositor to Warehouseman for or in respect of any period after the Expiration Date.

7.5.    *Invoices For Fees*.   No later than ten (10) days after the last day of each calendar month, Warehouseman shall provide Depositor with an invoice for all Handling Fees both fixed and variable identified in Exhibit B which Warehouseman believes are payable by Depositor to Warehouseman in respect of the immediately prior calendar month.  Each such invoice shall, at a minimum, with reasonable particularity, identify (a) the quantity of all units of all commodities described on Exhibit B hereto which were received by Warehouseman at the Premises during the immediately prior month, (b) if applicable, the quantity of all units of all Product cans and bottles which were repackaged by Warehouseman at the Premises during the immediately prior month for which Depositor is liable to Warehouseman under this Agreement, (c) if applicable, the number of hours worked by each employee of Warehouseman during the immediately prior month in such repackaging activity, (d) if applicable, the number of hours worked by each employee of Warehouseman on any Sunday or Holiday during the immediately prior month, and (e) such other information as Depositor may from time-to-time request.  Each such invoice shall be accompanied by such supporting documents as Depositor may from time-to-time request.

7.6.    *Payment Of Fees*.   Not later than the next scheduled payment date in accordance with Depositor's monthly accounts payable disbursement cycle occurring one hundred twenty (120) days after the day on which Depositor receives an invoice from Warehouseman for Fees, Depositor shall pay to Warehouseman the full amount of the invoice or, if Depositor disputes the total amount of the invoice, Depositor shall pay to Warehouseman the extent of the undisputed portion of the invoice.  The Parties shall attempt amicably to resolve all such disputes within a reasonable period.  Interest shall accrue at the rate of ten percent (10%) per annum on the undisputed portion of an invoice from the one hundred sixtieth (160th) day after the day on which Depositor received that invoice until the day on which such undisputed portion is paid by Depositor to Warehouseman.

7.7.    *Payment No Admission*.   In no event and under no circumstance shall payment of Fees by Depositor to Warehouseman constitute Depositor's acknowledgment of the propriety of the Fees or a waiver by Depositor of any right or remedy which it has or could have if the Fees properly were not due and payable by it to Warehouseman.  Likewise, acceptance of

- 20 -

Fees by Warehouseman shall not constitute Warehouseman's acknowledgment of the propriety of the Fees so received or a waiver by Warehouseman of any right or remedy which it has or could have if the Fees were not fully or properly paid by Depositor.

7.8.   *Review Of Fees.*  The Parties agree to review the Fees for each Fiscal Year after the first Fiscal Year of the Term to determine if the Fees prospectively require adjustment based upon increases or decreases in Warehouseman's operating costs including, without limitation, the costs to Warehouseman of labor, material handling equipment, taxes, and insurance at and in respect of the Premises.  Further in respect of the foregoing:

7.8.1.   In the event either of the Parties proposes an increase or decrease in Fees for the next succeeding Fiscal Year, then at least ninety (90) days prior to the last day of the then current Fiscal Year, the proposing Party shall give a Notice to the other Party which sets forth the proposed Fees ("Proposed Fees") for the next succeeding Fiscal Year which shall be in at least the detail as is contained in Exhibit B and Exhibit C hereto, and if such Notice is given by Warehouseman, then, to be effective, the Notice shall be accompanied by a fully completed Operating Cost Report for the immediately preceding twelve (12) month period.

7.8.2.   Within thirty (30) days after the day on which a Party receives a Notice called for in Section 7.9.1 hereof, the other Party shall respond to such Notice by giving a Notice to the proposing Party which sets forth such Party's acceptance or rejection of, or its counter-proposal to, the Proposed Fees, and if such Notice is given by Warehouseman, then, to be effective, the Notice shall be accompanied by a fully-completed Operating Cost Report for the immediately preceding twelve (12) month period.

7.8.3.   In the event there is disagreement regarding the Fees for the succeeding Fiscal Year, then the Parties agree to negotiate in good faith regarding the Fees for the next succeeding Fiscal Year.  If they are able to come to an agreement thereon, such Fees shall be set forth in a writing which is executed by both of the Parties.  If such agreement occurs prior to the first day of the next succeeding Fiscal Year, they shall take effect on the first day of the next succeeding Fiscal Year or, if such agreement occurs after the first day of such Fiscal Year, they shall be effective retroactive to the first day of such Fiscal Year with such adjustments, if any, made on account of any Fees which are paid in respect of such Fiscal Year.  If however, there is no such agreement and it reasonably does not appear that there will be such an agreement, then either Party shall have the right to terminate this Agreement pursuant to Section 18.3 hereof and, if such termination is effective after the first day of a Fiscal Year, then the Fees in effect for the immediately prior Fiscal Year shall be the Fees which are applicable through the Expiration Date.

## 8.   *Ownership, Storage And Identification Of Products, Returnables and Supplies.*

8.1.   *Storage And Ownership Generally.*  All Products, Supplies and Returnables received by Warehouseman shall be stored only in the Warehouse, and the Premises shall not be used at any time during the Term for any purpose other than the storage of Products, Supplies and Returnables of Depositor and the provision of Services.  The Products, Supplies and Returnables owned by Depositor as provided in Section 8.2, Section 8.3 and Section 8.4 hereof shall be identified as Depositor's property at all times while the same are at the Premises.

- 21 -

8.2.   *Ownership Of Products.*   At all times during the Term and after the Expiration Date, all Products shipped by Depositor to the Premises shall constitute and remain the sole and exclusive property of Depositor, except that (a) ownership of Products picked up at the Premises by a Wholesaler shall transfer from Depositor to that Wholesaler at such time as Warehouseman loads those Products on carriers of or for that Wholesaler, irrespective of whether the correct type and/or quantity of Products are loaded on carriers of or for a Wholesaler, and (b) ownership of Products which are shipped from or by a Wholesaler to the Premises for storage by Warehouseman thereat shall (i) if they are picked up by Depositor from a Wholesaler at a Wholesaler's business premises, transfer from that Wholesaler to Depositor at such time as the Products are loaded on carriers of or for Depositor for shipment to the Warehouse, at which time ownership of those products shall transfer from that Wholesaler to Depositor, or (ii) if they are delivered by or for a Wholesaler to the Premises, transfer from that Wholesaler to Depositor at such time as the Products are loaded off the carriers on which the Products arrive at the Premises.

8.3.   *Ownership Of Returnables.*  All Returnables shall at all times constitute and remain the sole and exclusive property of Depositor.

8.4.   *Ownership Of Supplies.*  All Supplies shall at all times constitute and remain the sole and exclusive property of Depositor unless and until the Supplies are consumed by Warehouseman in connection with its performance and provision of Services.

8.5.   *Waiver And Disclaimer Of Liens.*  Warehouseman hereby forever waives, releases and disclaims any and all liens of any type, nature or description whatsoever in or to any Products, Supplies, Returnables, System Hardware and all other property of Depositor to which Warehouseman might otherwise be entitled under any applicable Federal, state or local statutory or common law, including, without limitation, the UCC of any state having jurisdiction over this Agreement or the transactions contemplated by this Agreement.  Warehouseman shall not claim any right or interest in any Products, Supplies, Returnables, System Hardware or other property of Depositor.  Warehouseman shall not encumber, lease, transfer, sell or otherwise dispose or permit the encumbrance, lease, transfer, sale or other disposal of any of the foregoing items except with the prior written approval of Depositor.  Subject to the foregoing, any purported encumbrance, lease, transfer, sale or other disposition of any of the foregoing items shall be null and void and of no force or effect *ab initio*.

8.6.   *UCC Financing Statements.*  Concurrent with execution and delivery of this Agreement by Warehouseman and thereafter at such times as Depositor requests from time- to-time, Warehouseman duly shall execute and deliver to Depositor all UCC-1 financing statements (and continuations thereof) as Depositor shall deem necessary and/or appropriate to evidence its title to and interest in Products, Supplies, Returnables and System Hardware and/or other property of Depositor; provided, however, Warehouseman grants Depositor the right, with respect to Products, Supplies, Returnables and System Hardware and/or other property of Depositor, to (a) file UCC-1 financing statements (and continuations thereof) which have not been executed by Warehouseman, and (b) execute UCC-1 financing statements (and continuations thereof) for and on behalf of Warehouseman as its attorney-in-fact to such limited extent, in each instance to the extent permitted by applicable law.

- 22 -

## 9. *System Hardware And System Applications.*

9.1.    *Installation Of System Hardware.*   Prior to the Commencement Date, Depositor shall, at its sole cost and expense, install or cause the appropriate System Hardware to be installed at the Premises, some of which is to be used by Warehouseman and some of which shall be for the exclusive use of Depositor. Notwithstanding the foregoing, Depositor shall provide the appropriate System Hardware which is to be installed on forklifts used at the Premises and Depositor shall be responsible for installing such System Hardware properly on such forklifts.

9.2.    *System Hardware Changes.*   Depositor shall, at its sole cost and expense, have the right at any time and from time-to-time during the Term to change the System Hardware or substitute different computer hardware for any System Hardware then existing in the Warehouse, in which event the substituted computer hardware shall constitute System Hardware while it is located at the Premises.

9.3.    *Restricted Use Of System Hardware.*   Warehouseman shall not use any of the System Hardware for any purpose other than in connection with the performance and provision of Services.

9.4.    *No Ownership By Warehouseman.*   Warehouseman shall not have any ownership interest in the Computer, the System Applications or the System Hardware.

9.5.    *Program Files.*   Depositor shall, in cooperation with appropriate employees of Warehouseman, set up appropriate program files in the System Applications.

9.6.    *System Applications License.*   Depositor grants Warehouseman a limited, non-assignable and non-exclusive license to use the System Applications solely in connection with the performance and provision of Services and, accordingly, Warehouseman shall not use the System Applications for any other purpose.  The term of such license shall commence on the Commencement Date and shall end on the day on which Depositor notifies Warehouseman that such license is terminated, but in the absence of any such notification, the term of such license shall end on the last day of the Term.

9.7.    *Removal Of System Hardware.*   At the expiration of the Term, Warehouseman shall remove from its forklifts, which it is to remove from the Premises, all System Hardware which then is attached to those forklifts and safely shall secure such System Hardware at the Premises for Depositor, it being understood thereby that Warehouseman shall not affect such removal from forklifts which Depositor is to purchase from Warehouseman pursuant to Section 18.11 hereof.

## 10. *Disclaimer Of Warranties; Acquisition Of Equipment.*

10.1.    *Disclaimer Of Warranties.*  As between the Parties, Depositor disclaims and excludes any and all warranties, expressed or implied, with respect to the operation of the Computer, the System Applications, the System Hardware and the CEW Refrigeration including,

- 23 -

without limitation, warranties of merchantability or fitness for a particular purpose, it being understood that the foregoing is not intended to limit any warranties of the manufacturers of such items, respectively.

10.2.   *Acquisition of Equipment.*   Both prior to and after execution of this Agreement, Warehouseman shall use reasonable efforts to obtain the written agreement of each entity from which Warehouseman unconditionally contracts to purchase or lease the Equipment that Warehouseman has the right, for the longest period available to Warehouseman, to cancel the applicable contract without any penalty or, if that is not possible, at the smallest penalty which Warehouseman is able to negotiate.

10.3.   *Equipment Lease Provisions.*   If Warehouseman leases rather than purchases any Equipment, Warehouseman shall insure that the lease and related transaction documents, if any, regarding the Equipment provide that (a) the Equipment encompassed thereby may, at the option of the lessee, be purchased at any time during the lease term and upon expiration of such term, and (b) Warehouseman shall have the right to assign such lease to Depositor without the prior written consent of the lessor.

## 11. *Confidentiality; Trademarks.*

11.1.   *Marketing And Distribution Of Products.*   Warehouseman acknowledges that Depositor shall suffer substantial and irreparable injury if any of the Products marketed or distributed in any manner other than in accordance with Depositor's marketing and distribution strategies, plans and procedures.

11.2.   *Ownership Of Trademarks.*   Warehouseman acknowledges that all of Depositor's trademarks, label designs, product identification, logos and artwork associated with the Products are the exclusive property of Depositor and that Warehouseman acquires no rights hereunder to use, display or associate itself with such property, except upon the prior written approval of Depositor.

11.3.   *Confidentiality.*   During the Term and after expiration of the Term for any reason, Warehouseman shall maintain all Confidential Information in the strictest of confidence and shall not disclose any Confidential Information to any person or entity other than (a) to Depositor, and (b) to such extent as is required in order for Warehouseman to comply with all applicable laws.

11.4.   *Participation In Surveys.*   During the Term and after expiration of the Term for any reason, Warehouseman agrees not to participate in any surveys, questionnaires, inquiries or requests, regarding Depositor, its Products or its business in any manner whatsoever without Depositor's prior written approval.

12. *Access To Records.*   Warehouseman shall maintain appropriate records to reflect all Services provided and performed under this Agreement and the cost to Warehouseman to provide and perform all of such Services and, upon request by Depositor from time-to-time,

- 24 -

Warehouseman shall make such records and all Documents available to and for Depositor, its agents, employees and/or contractors, to review and/or audit at the Premises, during Normal Working Hours during the Term and for a period of three (3) years after the Expiration Date at the address provided for purposes of notice in Section 21.1 hereof or at such other location in or near the location of the Warehouse, as Depositor determines appropriate, Notice of which shall be given by Warehouseman to Depositor promptly upon removal of such records and Documents to the new location. In addition, at Depositor's request from time-to-time, Warehouseman shall provide to Depositor copies of such records and Documents at cost for the account of Depositor.

### 13. *Relationship Of The Parties.*

13.1. *Independent Contractors.* Nothing contained in this Agreement, nor any act of either of the Parties, shall be deemed or construed to create the relationship between them of principal and agent, franchisor and franchisee, partners, joint venturers, employer and employee, landlord and tenant or sublandlord and subtenant. Without limiting the generality of the foregoing, (a) no employee of Warehouseman shall be or constitute an employee of Depositor for any purpose whatsoever, and (b) Depositor shall not have any supervisory rights regarding any of Warehouseman's employees.

13.2. *No Grant Of Authority.* Warehouseman is not granted nor shall it have any right or authority to accept orders on behalf of Depositor, to create any other obligations, express or implied, on behalf of Depositor or to bind Depositor for any other purpose or in any other manner.

13.3. *Personal Services Contract.* This Agreement is and shall be deemed to be a personal services contract between the Parties.

### 14. *Utilities And Other Expenses.*

14.1. *Depositor Utilities.* Depositor shall (a) cause the electricity for the CEW Refrigeration to be metered separately from all other electricity provided to and at the Premises, (b) pay all metered charges for such electricity which is utilized in respect of the CEW Refrigeration, which separately shall be billed to and in the name of Depositor, (c) cause separate telephone lines which are dedicated solely for use by the Computer at the Premises or solely for use by Depositor in the office which it maintains at the Premises to be installed at the Premises for such purposes, and (d) pay for all charges associated with such telephone lines, which separately shall be billed to and in the name of Depositor.

14.2. *Warehouseman Utilities.* Except to the limited extent set forth in Section 14.1 hereof, Warehouseman timely shall pay when due for all electricity, sewer, water, gas (if any) and other utilities which are utilized at the Premises. (The utility costs of sewer and water usage at the Premises are the only utility costs which are and are to be encompassed by the Facility Maintenance Fee.)

14.3. *CEW Refrigeration Expenses.* Subject to the further provisions of this Section 14, Depositor timely shall pay for all CEW Refrigeration Expenses provided (a) the CEW

- 25 -

Refrigeration Expenses are incurred by Warehouseman with qualified independent third-party contractors, (b) the invoices of such contractors for such CEW Refrigeration Expenses are addressed to Depositor and timely are provided to Depositor for payment, and (c) Warehouseman duly and timely has complied with all obligations of Warehouseman regarding, or which otherwise are applicable to, the CEW Refrigeration.

14.4.   *System Hardware Expenses.*   Subject to the further provisions of this Section 14, Depositor timely shall pay for all System Hardware Expenses provided (a) the System Hardware Expenses are incurred by Warehouseman with qualified independent third party contractors, (b) the invoices of such contractors for such System Hardware Expenses are addressed to Depositor and timely are provided to Depositor for payment, (c) Warehouseman duly and timely has complied with all obligations of Warehouseman regarding, or which otherwise are applicable to, the System Hardware.

14.5.   *Approved Third-Party Contractors.*   Subject to Section 14.6 hereof and the last sentence of Section 5.4 hereof, the qualified independent third-party contractors which shall provide the services to which references are made in Section 14.3 and Section 14.4 hereof shall be those identified on the then current list of approved contractors provided by Depositor to Warehouseman, which list may specify certain services which must be performed by certain contractors and/or which may not be performed by certain contractors, it being understood thereby that, from time-to-time, (a) Depositor shall have the right to remove contractors from, and add contractors to, that list by advising Warehouseman thereof, and (b) consent to the removal of contractors from, and the addition of contractors, to such list of approved contractors by advising Warehouseman thereof as and when a request therefore is made of Depositor by Warehouseman.

14.6.   *Service And Maintenance Agreements.*   Warehouseman shall procure such service and/or maintenance agreements in respect of the CEW Refrigeration and the System Hardware, respectively, as Depositor may from time-to-time request, it being understood thereby that (a) Warehouseman shall utilize such procured agreements to the extent of the benefits there under when satisfying its obligations under Section 5.4 hereof, and (b) Depositor's obligations under Section 14.3 and Section 14.4 hereof shall be limited to the extent the expenses encompassed thereby are covered by such procured agreements. All of such agreements shall be in Depositor's name and the invoices therefore shall be addressed to Depositor and timely provided to Depositor for payment.

14.7.   *Utilization Of Warranties.*   Warehouseman shall, to the extent available, utilize the benefit of all warranties regarding the CEW Refrigeration and the System Hardware, respectively, in order to diminish Depositor's obligations set forth in (a) Section 14.3 hereof regarding CEW Refrigeration Expenses, and (b) Section 14.4 hereof regarding System Hardware Expenses.

14.8.   *No Warehouseman Liability For Quality Of Services By Others.* Warehouseman shall not be responsible for the quality of the services to which references are made in Section 14.3 and Section 14.4 hereof provided Warehouseman complies with the applicable provisions of this Agreement which relate to the contractors which provide those services.

- 26 -

15. ***Insurance.***

15.1.   *Warehouseman's General Insurance Obligations.*  At all times during the Term, Warehouseman agrees to maintain insurance, underwritten by insurance companies authorized to do business in the State of California and which are reasonably satisfactory to Depositor, as follows:

15.1.1.   Insurance covering the legal liability of Warehouseman under the Workers' Compensation Act of the state of California and under any other employee benefit statute or similar law to pay claims for bodily injuries, including death and disease sustained by employees, including employer's liability coverage of not less than One Million Dollars ($1,000,000.00).

15.1.2.   Commercial general liability insurance coverage, with a per occurrence limit in the amount of Five Million Dollars ($5,000,000.00), a general aggregate limit of Five Million Dollars ($5,000,000.00) and a completed operations aggregate of Five Million Dollars ($5,000,000.00) covering damage to property and injuries to, or the death of, any person or persons occurring in or about the Premises, including the Warehouse.  Warehouseman shall obtain a contractual liability endorsement to such policy for coverage of Warehouseman's indemnity to Depositor pursuant to Section 16.1 hereof.

15.1.3.   Warehouseman's legal liability insurance coverage, covering loss of or damage to Products, Supplies and Returnables while they are located in or about the Warehouse or the Premises, regardless of any limitation of Warehouseman's liability thereof which may be contained in any warehouse receipt, in the amount of Five Million Dollars ($5,000,000.00).

15.2.   *Warehouseman's Property.*

15.2.1.   At all times during the Term from and after the Commencement Date, Warehouseman shall maintain insurance, underwritten by insurance companies authorized to do business in the state of California and which are reasonably satisfactory to Depositor, which provides to Warehouseman full replacement cost coverage as to the Equipment and all of Warehouseman's other property, whether owned or leased, which is located in the Warehouse or otherwise in or about the Premises, from (a) loss or damage by fire, (b) loss or damage by other risks or hazards now or hereafter covered by a so-called "extended coverage endorsement" including, without limitation, windstorm, hail, explosion, vandalism, riot and civil commotion, damage from vehicles, smoke damage, water damage and debris removal, (c) loss from flood or sewer back-up, and (d) loss from so-called explosion, collapse and underground hazards.

15.2.2.   Warehouseman waives, releases and discharges Depositor and its agents, employees, successors and assigns, from and against all claims, demands and expenses whatsoever arising out of any loss, damage or destruction of or to the Equipment and/or any of Warehouseman's other property, whether owned or leased, which is located in the Warehouse or otherwise in or about the Premises or any loss of use of any of such property or business interruption, in each instance irrespective of whether the loss, damage or destruction may have

- 27 -

been caused by Depositor or its agents, employees, successors or assigns, and Warehouseman waives all rights of subrogation which any of Warehouseman's insurers have or could have against Depositor and/or its agents, employees, successors and assigns, in the event of any loss, damage or destruction of or to the Equipment and/or any of such other property of Warehouseman or any loss of use of any of such property or business interruption.

        15.2.3.  Independent of Section 16 hereof, Warehouseman agrees to indemnify and defend Depositor, and its respective agents and employees, from and against all claims, demands and expenses whatsoever arising out of any loss, damage or destruction of or to any of the Equipment and any of Warehouseman's other property, whether owned or leased, which is located in the Warehouse or otherwise in or about the Premises or any loss of use of any of such property or business interruption, in each instance irrespective of whether the loss, damage or destruction may have been caused by Depositor and/or its agents and/or employees, successors or assigns.

        15.3.  *Notification Of Policy Cancellation.*  All policies of insurance which Warehouseman is required to maintain pursuant to Section 15.1 and Section 15.2.1 hereof shall provide that Depositor shall be notified of cancellation or modification of such policies at least thirty (30) days prior to the effective date of such cancellation or modification, evidence of which shall be reflected on all certificates and renewal certificates of such insurance.

        15.4.  *Certificates Of Insurance.*

        15.4.1.  Certificates and renewal certificates evidencing the insurance coverage required to be maintained by Warehouseman under Section 15.1 hereof shall be provided to Depositor on the Effective Date and at least ten (10) days prior to any expiration of any of such coverages.

        15.4.2.  Certificates and renewal certificates evidencing the insurance coverage required to be maintained by Warehouseman under Section 15.2.1 hereof shall be provided to Depositor on the Commencement Date and at least ten (10) days prior to any expiration of any of such coverages.

        15.4.3.  All of such certificates and renewal certificates (other than workers' compensation and Warehouseman's legal liability) shall certify that Depositor is an additional insured under the policies, and the certificate and renewal certificates regarding the insurance described in Section 15.1.3 hereof also shall certify that Depositor is a loss payee as its interest may appear.

        15.4.4.  Failure to provide the required certificates or renewal certificates in the manner and at the times required or to maintain the coverages required to be maintained by Warehouseman pursuant to Section 15.1 and Section 15.2.1 hereof, respectively, shall be deemed to be a material breach of this Agreement.

- 28 -

15.5. *Waivers Of Subrogation.* Warehouseman shall deliver to Depositor a waiver of subrogation against Depositor from the insurers providing the coverages described in Section 15.1, Section 15.2.1 and Section 15.9 hereof.

15.6. *Depositor Insurance Obligation.* Depositor shall carry and maintain appropriate fire and related perils insurance protecting the Products.

15.7. *Compliance With Insurance Policy Requirements.* Warehouseman fully shall comply with, satisfy, observe and perform all of, and shall not violate or permit to be violated any of, the conditions of the policies of insurance (a) maintained by Warehouseman as required by Section 15.1 and Section 15.2.1 hereof, respectively, and (b) maintained by Depositor as required by Section 15.6 hereof.

16. ***Indemnification.***

16.1. *Indemnification Of Claims.* Subject to the further provisions of this Section 16, each of the Parties shall indemnify and hold harmless (a) the other Party, (b) the direct and indirect corporate affiliates of the other Party, and (c) the directors, officers, employees and agents of the other Party and such corporate affiliates, respectively, and each and all of them, from and against any loss, cost, liability or expense of any sort or nature including, without limitation, reasonable attorneys', accountants' and expert witness fees and expenses, which the Indemnitees, or any one or more of them, may sustain or incur as a result of (i) any negligent or wrongful act or omission by or which properly is attributable to the indemnifying Party, (ii) any failure by the indemnifying Party properly and/or timely to comply with any of the obligations which are imposed on the indemnifying Party under or as a result of this Agreement, and/or (iii) the falsity of any representation and warranty made by the indemnifying Party in this Agreement.

16.2. *Notice Of Indemnified Claim.* The Indemnitee in respect of a Claim encompassed by Section 16.1 hereof shall give, or shall cause to be given to, the Indemnitor in respect of that Claim, a Notice promptly after the day on which that Indemnitee first receives actual notice of that Claim, except that failure of an Indemnitee to give or cause such Notice to be given promptly shall not diminish or negate the indemnification obligation of the Indemnitor to that Indemnitee except to the extent the delay actually causes the Indemnitor to sustain additional liability. To be effective, such Notice shall be accompanied by a copy of such written documents, if any, as are provided to or reasonably available to that Indemnitee regarding the Claim identified in such Notice.

16.3. *Right To Assume Defense Of Indemnified Claim.* The Indemnitor shall have the right to assume the defense of a Claim which is the subject of a Notice given pursuant to Section 16.2 hereof by giving Notice thereof to the applicable Indemnitee, except if such Indemnitee is not a Party, such notice to such Indemnitee shall be given by the Indemnitor to such Indemnitee in care of the other Party. Each Indemnitee shall have the right to require the Indemnitor to assume the defense of a Claim against that Indemnitee which is the subject of such a Notice by giving, or by causing to be given to, the Indemnitor a Notice thereof.

534605.01
REV 06-18-2015

16.4. *Participation And Cooperation In Defense Of Indemnified Claim.* If the Indemnitor assumes the defense of a Claim against an Indemnitee pursuant to Section 16.3 hereof, the applicable Indemnitee shall (a) have the right to participate in the defense of such Claim, and (b) be obligated reasonably to cooperate with the Indemnitor in the defense of such Claim, all at the sole cost and expense of that Indemnitee.

16.5. *Settlement Of Indemnified Claims.* In all events and under all circumstances, settlement of a Claim, encompassed by Section 16.1 hereof, by an Indemnitee without the prior written consent of the Indemnitor shall release the Indemnitor from all liability to the settling Indemnitee with respect to the settled Claim.

### 17. *Casualty And Condemnation.*

17.1. *Condemnation Of Portion Of Premises.* Anything set forth in this Agreement to the contrary notwithstanding, at such time as there is a condemnation of a portion of the Premises, such condemned portion also shall no longer constitute a part of the Premises.

17.2. *Loss, Damage Or Destruction Of Premises.* Notwithstanding Section 7.2 hereof, in the event there is any loss, damage or destruction of or to all or a portion of the Premises, there shall be an equitable adjustment in the Facility Maintenance Fee from the day on which such casualty first occurs until such time as the first of the following events occurs, namely (a) the Premises or such portion, as applicable, fully is restored to its condition as existed prior to such casualty and again is suitable for its intended use and purpose, (b) there is an agreement between the Parties pursuant to Section 7.9 hereof regarding the Facility Maintenance Fee, (c) the natural expiration of the Term, and (d) this Agreement is terminated pursuant to Section 18 hereof because of the happening of such damage or destruction.

17.3. *Warehouseman's Waiver Of Insurance Proceeds.* Warehouseman hereby waives any right to receive all or any portion of the insurance proceeds which are payable on account of a casualty to the Premises on account of insurance maintained by Depositor on account of which such proceeds are paid.

17.4. *Adjustment In Facility Maintenance Fee.* Notwithstanding Section 7.2 hereof, in the event there is a condemnation of a portion of the Premises, there shall be an equitable adjustment in the Facility Maintenance Fee from delivery of such portion to the condemning authority until such time as the first of the following events occurs, namely (a) there is an agreement between the Parties pursuant to Section 7.9 hereof regarding the Facility Maintenance Fee, (b) the natural expiration of the Term, and (c) this Agreement is terminated pursuant to Section 18 hereof including, without limitation, because of the condemnation.

17.5. *Condemnation Award.* In the event there is a condemnation of all or any portion of the Premises, Warehouseman (a) assigns to Depositor any and all interest which Warehouseman otherwise may have or claim to have in and to any award made in connection with the condemnation, and (b) waives any right which Warehouseman otherwise has or may have under any applicable present or future law to receive any award or portion thereof arising out of or in connection with, or as a result of, the condemnation.

- 30 -

18. *Termination.*

    18.1.  *No Agreement On Fees.* Each of the Parties shall have the right to terminate this Agreement, effective ninety (90) days after the day on which Notice thereof is given by one of the Parties to the other Party or on such later date which may be specified in such Notice, in the event the Parties are unable to come to an agreement, under Section 7.9 hereof, regarding Fees, all without liability as a result of a termination of this Agreement for such reason except as otherwise provided in this Section 18 hereof.

    18.2.  *Termination By Warehouseman.* Warehouseman shall have the right to terminate this Agreement in accordance with the following:

    18.2.1.  Warehouseman shall have the right to terminate this Agreement, effective on the day on which Notice thereof is given by Warehouseman to Depositor or on such later date which may be specified in such Notice, if Depositor does not satisfy its obligations set forth in Section 2.1 hereof.

    18.2.2.  Warehouseman shall have the right to terminate this Agreement if Depositor fails to pay Warehouseman any Fees which Depositor does not dispute or if Depositor fails to perform any of its other obligations set forth in this Agreement, in each instance provided (a) Warehouseman gives Depositor a Notice which specifies the default, (b) such Notice of default is not cured within thirty (30) days after the day on which Warehouseman gives Depositor such Notice, and (c) Warehouseman thereafter gives Depositor a Notice of termination while the noticed default continues which, to be effective, shall specify the effective date of termination which may not be less than fifteen (15) days after the day on which such Notice of termination is given by Warehouseman to Depositor.

    18.3.  *Termination By Depositor.* Depositor shall have the right to terminate this Agreement in accordance with the following:

    18.3.1.  Depositor shall have the right to terminate this Agreement, effective on the day on which Notice thereof is given by Depositor to Warehouseman or on such later date which may be specified in such Notice, upon or as a result of the happening of any of the following events, namely (a) if Depositor after use of its best efforts is unable to satisfy its obligations under Section 2.1 hereof, (b) if Warehouseman does not satisfy its obligations under Section 2.2 hereof, (c) a breach by Warehouseman of any of its obligations under Section 15 hereof, or (d) if Warehouseman commits any breach of this Agreement which is not capable of being cured.

    18.3.2.  Depositor shall have the right to terminate this Agreement if Warehouseman fails to observe or perform any of its obligations set forth in this Agreement which is capable of being cured provided (a) Depositor gives Warehouseman a Notice which specifies the default, (b) such noticed default is not cured within thirty (30) days after the day on which Depositor gives Warehouseman such Notice, and (c) Depositor thereafter gives Warehouseman a

534605.01
REV 06-18-2015

termination Notice which may specify the effective date of termination if other than the date of such Notice.

18.3.3. Depositor shall have the right to terminate this Agreement, effective on the date Notice thereof is given by Depositor to Warehouseman or such later date which may be specified in such Notice, upon or as a result of the happening of any of the following events, namely (a) the making by Warehouseman of any general arrangement or general assignment for the benefit of creditors, (b) Warehouseman becomes a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Warehouseman, the same is dismissed within sixty (60) days after the day on which the petition is filed), (c) the appointment of a trustee or receiver to take possession of substantially all of Warehouseman's assets located at the Premises and/or of Warehouseman's interest in this Agreement if the same are not restored to Warehouseman within thirty (30) days after the day on which such taking occurs, (d) the attachment, execution or other judicial seizure of substantially all of Warehouseman's assets located at the Premises or of Warehouseman's interest in this Agreement if such attachment, execution or seizure is not discharged within thirty (30) days after the day on which such event occurs, (e) a material change of share ownership of Warehouseman other than among its current shareholders, their lineal descendents, and trusts established for the benefit of such parties, (f) a temporary or permanent suspension of any Warehouseman License or a failure by Warehouseman to maintain current all Warehouseman Licenses, (g) the commission by Warehouseman of any fraudulent conduct in connection with its performance of any Services, (h) a breach by Warehouseman of Section 11.3 or Section 11.4 hereof, (i) the falsity of any representation and warranty made by Warehouseman in Section 19.1 or Section 19.2 hereof, and/or j) in the event of any labor dispute or strike, whether of an economic or unfair labor practice nature, or any dispute resulting in picketing, walkouts, or refusal to handle the product or any other condition limiting Depositor's ability to move the Product in an expeditious manner, with respect to Warehouseman or the Premises.

18.3.4. Subject to the further provisions of this Section 18.4.4, Depositor shall have the right to terminate this Agreement, effective on the date Notice thereof is given by Depositor to Warehouseman or on such later date which may be specified in such Notice, if the Premises or any portion thereof is, in Depositor's reasonable judgment, so damaged or taken by casualty or condemnation that the Premises is rendered unfit, unsafe, insufficient and/or inaccessible for the uses intended by this Agreement and such condition cannot be or is not fully and properly corrected within fifteen (15) days after the day on which such condition occurs. Warehouseman shall give Depositor prompt Notice after such a condition occurs, and the right of Depositor to terminate this Agreement pursuant to the foregoing must be exercised by Notice thereof given by Depositor to Warehouseman no later than fifteen (15) days after the day on which the aforesaid Notice by Warehouseman to Depositor is given.

18.3.5. Depositor shall have the right to terminate this Agreement without cause, and such termination shall be effective upon no less than ninety (90) days prior written Notice thereof given by Depositor to Warehouseman or on the date which may be specified in such Notice. Such right of termination shall exist irrespective of whether Depositor may already have given Warehouseman a Notice pursuant to any of the foregoing provisions of this Section 18.4 upon the happening of an event described therein as to which Warehouseman is given a cure period

- 32 -

as therein provided.  Depositor shall endeavor to provide Warehouseman with as much advance notice as is reasonably possible of Depositor's intention to terminate this Agreement pursuant to this Section 18.4.5, it being understood thereby, however, that a failure, for any reason, of Depositor to give such notice shall not (a) diminish or eliminate Depositor's termination rights pursuant to this Section 18.4.5, or (b) cause Depositor to incur any liability to Warehouseman.

       18.4.  *Duties Upon Termination.*  Without limiting the generality of Section 4.5.15 and Section 4.7 hereof, in the event of any termination of the Agreement, Warehouseman shall promptly vacate the Premises and remove from the Premises all property belonging to Warehouseman which is not to be purchased by Depositor pursuant to Section 18.10 hereof, and all of such property which is to be removed by Warehouseman but remains at the Premises on the tenth (10th) day after the Expiration Date shall be deemed abandoned by Warehouseman, except that Warehouseman shall be liable to Depositor for all costs and expenses which Depositor may sustain or incur in the removal of such property from the Premises and in the disposition of such property thereafter.

       18.5.  *Effect Of Termination.*  A termination of this Agreement pursuant to the foregoing provisions of this Section 18 shall render this Agreement null and void and of no further force or effect.  However, said termination shall not (a) diminish any monetary obligation which accrues during the Term, or (b) diminish any right or remedy as a result of any breach of this Agreement including, without limitation, any claim for damages as a result of the act or omission which gives rise to the right of termination, all of which shall survive such a termination and expiration of the Term.

       18.6.  *Effective Date Of Termination.*  The effective date of a termination of this Agreement shall constitute the last day of the Term (as well as the Expiration Date).

       18.7.  *Termination Under Section 18.2 Or Section 18.3.*  In the event of a termination of this Agreement pursuant to Section 18.2 hereof prior to the Commencement Date but, in either instance, after Warehouseman has unconditionally contracted to purchase or lease some or all of the Equipment, Depositor shall have the right and option to, as determined appropriate by Depositor in its sole and absolute discretion, undertake to satisfy all of Warehouseman's obligations regarding some or all of such Equipment by Notice thereof given by Depositor to Warehouseman within ten (10) days after the Expiration Date.  If Depositor fails to give such Notice timely, Depositor shall be deemed to have waived such right and option as to all of such Equipment or, if Depositor gives such Notice timely as to some but not all of such Equipment, Depositor shall be deemed to have waived such right and option only as to the Equipment as to which such right and option was not exercised by such Notice.  Subject to satisfaction by Warehouseman of its obligations under Section 10.2 hereof, Depositor's obligation to Warehouseman as to such of such Equipment as to which Depositor has not exercised such right and option shall be to reimburse Warehouseman for any resultant loss to Warehouseman which is caused by cancellation of the contracts regarding such remaining Equipment or disposal of such remaining Equipment; provided, however, such reimbursement obligation shall be conditioned upon Warehouseman having used its best efforts to minimize such losses by then (a) negotiating with the other party to the contracts, respectively, for such remaining Equipment for cancellation of such contracts at the smallest penalty, (b) disposing of such remaining Equipment at the best

- 33 -

price attainable by Warehouseman, or (c) where feasible, transferring such remaining Equipment to Warehouseman's other warehousing operations, the effect of which shall be to eliminate Depositor's reimbursement obligation in respect of the transferred Equipment.

18.8.   *Required And Permitted Purchase Of Equipment.*  Subject to Section 18.8 and Section 18.11 hereof, in the event of a termination of this Agreement by either of the Parties for any reason, the sole liability and responsibility of Depositor therefor shall be to (a) purchase the Equipment which is then owned by Warehouseman, and/or (b) take an assignment of the lease regarding the Equipment which is then under lease to Warehouseman, in each instance if Warehouseman so demands by Notice thereof given by Warehouseman to Depositor within five *(5)* days after the Expiration Date.  If Warehouseman fails to give such Notice timely, Depositor shall have no such liability or responsibility but Depositor shall have the right and option to, as determined appropriate by Depositor in its sole and absolute discretion, (c) purchase some or all of the Equipment which is then owned by to Warehouseman, and/or (d) take an assignment of the lease regarding some or all of the Equipment which is then under lease to Warehouseman, in each instance by Notice of the exercise of such right and option given by Depositor to Warehouseman within ten (10) days after the Expiration Date.  If Depositor fails to give such Notice timely, Depositor shall be deemed to have waived such right and option as to all of the Equipment or, if Depositor gives such Notice timely as to some but not all of the Equipment, Depositor shall be deemed to have waived such right and option only as to the Equipment as to which such right and option was not exercised by such Notice.

18.9.   *Price Of Acquisition Of Equipment.*

18.9.1.   The total amount to be paid by Depositor to Warehouseman for the Equipment which is purchased by Depositor pursuant to Section 18.10 hereof shall be the greater of $100.00 and the unamortized cost of the Equipment as of the Expiration Date, namely the positive difference between (a) the original cost of the Equipment, and (b) the portion of such cost theretofore recouped by Warehouseman from Depositor as a part of the Handling Fees, it being understood thereby that (c) the original cost of all Equipment fully shall be recouped by Warehouseman at the end of the amortization period thereof, namely five (5) years, and (d) the original cost of all Equipment, fully shall be recouped by Warehouseman at the end of the amortization period for that Equipment.  For the foregoing purposes, the original cost of all Equipment shall be treated as being recouped by Warehouseman monthly from the Handling Fee on a straight-line basis by dividing such cost by the number of months in the applicable amortization period, irrespective of the useful life of the Equipment.

18.9.2.   The total amount to be paid by Depositor to Warehouseman for (a) the Equipment then under lease to Warehouseman, and (b) for the lease as to such Equipment as to as to which Depositor elects to take an assignment, shall be zero.

18.10.   *Consummation Of Acquisition Of Equipment.*  Warehouseman shall deliver or shall cause to be delivered to Depositor (a) valid legal title to all Equipment which is purchased pursuant to Section 18.10 hereof, free and clear of all charges, liens and encumbrances and, if applicable, any lease to Warehouseman regarding the Equipment, and a warranty bill of sale to such Equipment in accordance with the foregoing, (b) a due and proper assignment of the lease

- 34 -

regarding all Equipment under lease to Warehouseman as to which Depositor has elected to take an assignment of such lease pursuant to Section 18.10 hereof, free and clear of all charges, liens and encumbrances other than those created under such lease which are not yet due and payable, and (c) such Equipment in good working order and repair but, subject thereto, in an "AS IS" condition. The foregoing deliveries by Warehouseman shall constitute conditions precedent to the obligation of Depositor to, as applicable, pay for the subject Equipment and/or take an assignment of the lease as to the subject Equipment.

### 19. *Representations And Warranties.*

19.1.   *Requisite Authority.*  Each of the Parties represents and warrants to the other Party that (a) the execution and delivery of this Agreement by the representing Party duly have been authorized by all requisite corporate action of the representing Party, (b) this Agreement is and shall remain binding upon and enforceable against the representing Party in accordance with its terms, and (c) the individual who executes this Agreement on behalf of the representing Party has been duly authorized to do so.

19.2.   *Warehouseman's Specific Representations.*   Warehouseman further represents and warrants to Depositor that (a) the execution and performance of this Agreement by Warehouseman does not violate any contract, agreement or other matter to which Warehouseman is a party or by which Warehouseman is bound, (b) Warehouseman is not a retail liquor licensee at any location, and (c) Warehouseman has no ownership interest in any retail liquor license at any location.

19.3.   *Duration Of Representations.*  The representations and warranties set forth above in this Section 19 shall be deemed made on the date of this Agreement and continuously thereafter during the Term.

### 20. *Enforcement And Litigation.*

20.1.   *Cumulative Remedies.*  Except to the extent specifically provided to the contrary in this Agreement, the rights and remedies provided for in this Agreement are cumulative and are granted in addition to any and all other rights and remedies available to the Parties at law or in equity and, accordingly, the use of any one such right and/or remedy by either Party shall not preclude or waive the right to use any or all of such other rights and/or remedies.

20.2.   *Litigation Fees And Expenses.*  The prevailing Party in any litigation between the Parties to enforce any obligation of the other Party and/or for damages as a result of any breach of this Agreement by the other Party shall be entitled to seek and be awarded in such litigation the reasonable attorneys', accountants' and expert witness fees, costs and expenses incurred in, as applicable, the institution and prosecution or the defense of such litigation, all of which shall be in addition to such other relief as may be awarded to the successful Party in such litigation.

20.3.   *No Waiver.* Without limiting the generality of Section 7.8 hereof, the failure of either Party to object to or to take affirmative action, by way of instituting litigation or otherwise,

534605.01
REV 06-18-2015

with respect to any breach of this Agreement or other inappropriate conduct by the other Party shall not be construed as a waiver thereof or of any subsequent breach of this Agreement or other inappropriate conduct by the other Party.

21. *Notices.*

    21.1.   *How And Where Notices Given.* To be effective, all Notices shall be in writing and shall be sent by certified U.S. Mail, postage prepaid, return receipt requested, via a reputable overnight delivery service, or via facsimile transmission, addressed as follows:

| | |
|---|---|
| If to Warehouseman: | Dependable Companies, Inc.<br>Attn: Shane VanDerWaag, Director<br>800 East 230th Street<br>Carson CA 900745<br>310-522-4141 |
| If to Depositor: | Anheuser-Busch, LLC<br>One Busch Place<br>St. Louis, Missouri 63118<br>Attn: Director, Transportation<br>Facsimile No.: 314-577-7099 |
| With a copy to: | Anheuser-Busch Companies, LLC<br>Legal Department<br>One Busch Place<br>St. Louis, Missouri 63118<br>Attn: General Counsel<br>Facsimile No. (314) 577-0776 |

    21.2.   *Changes For Notice Purposes.* Either Party may change its address and/or the person to whose attention Notices are to be given and, in the case of Depositor, also the address and/or person to whose attention copies of Notices to Depositor are to be given, by giving Notice thereof to the other Party.

    21.3.   *Effective Date Of Notices.* Notices given (a) by U.S. Mail shall be deemed given on the earlier of (i) the day of receipt thereof by the intended recipient of the Notice, and (ii) three days after the day on which the Notice is deposited in the U.S. Mail, (b) by overnight delivery shall be deemed given the day of receipt thereof by the intended recipient of the Notice, and (c) via facsimile transmission shall be deemed given when the Notice is received by the intended recipient thereof provided the giver of the Notice receives written certification, generated by the facsimile machine used to give the Notice, that all pages of the Notice duly were transmitted.

    21.4.   *Other Communications.* All other notices, requests, demands, claims and other communications required or permitted under this Agreement need not be given in the manner provided for the giving of Notices but shall be deemed sufficiently given if in writing and given in the manner provided for the giving of Notices.

534605.01<br>REV 06-18-2015

22. ***Equal Opportunity Employment.***

      22.1.   *Compliance By Warehouseman.*   At all times during the Term, Warehouseman agrees to comply with the Equal Employment Opportunity Clause.

23. ***General Provisions.***

      23.1.   *Further Assurances.*  Each of the Parties agrees to execute and deliver such other documents as reasonably may be requested by the other Party in order further to evidence or give effect to this Agreement. Without limiting the generality of the foregoing, Warehouseman agrees to execute and deliver to Depositor such acknowledgments and/or agreements, not inconsistent with this Agreement, which, , are required to be given by Warehouseman in order for Warehouseman to occupy and use the Premises as is provided for herein.

      23.2.   *Assignment.*  Neither Party may assign its rights, obligations or remedies under or as a result of this Agreement to any person, corporation or other entity without the prior written approval of the other Party. Notwithstanding the foregoing, Depositor may assign its rights, obligations and/or remedies under or as a result of this Agreement to a direct or indirect corporate affiliate of Depositor upon Notice thereof given by Depositor to Warehouseman; provided, however, such an assignment shall not release Depositor from any of its obligations under or as a result of this Agreement.

      23.3.   *Binding Agreement.*  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

      23.4.   *Amendments.*  Subject to Section 1.43 hereof, this Agreement may be amended and modified only by a writing signed by an authorized representative of the Parties, respectively.

      23.5.   *Counterpart Execution.*  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

      23.6.   *Entire Agreement.*  This Agreement constitutes the entire understanding and agreement between the Parties with respect to the subject matter of this Agreement and supersedes all prior or contemporaneous written or oral agreements with regard thereto. Without limiting the generality of the foregoing, neither of the Parties shall be bound by any written or oral representation, warranty, projection or statement of any type regarding any matter which was, or concurrent with the execution of this Agreement is made by or for a Party, in connection with this Agreement or any matter related to this Agreement unless the same specifically is set forth in this Agreement.

534605.01
REV 06-18-2015

23.7.   *Exhibits.*  All exhibits to this Agreement to which references are made in this Agreement are, by reference thereto in this Agreement, incorporated into this Agreement as an integral part of this Agreement.

23.8.   *Defined Terms.*  All defined terms used in this Agreement shall be deemed to refer to the masculine, feminine, neuter, singular and/or plural, in each instance as the context and/or particular facts may require.  Further, use in this Agreement of the terms "hereof" and "hereto" constitutes references to this Agreement.

23.9.   *Headings.*  Headings of sections and sub-sections in this Agreement are for convenience only and do not constitute a substantive part of the Agreement.  Accordingly, such headings shall not be deemed to constitute a part of this Agreement when interpreting or enforcing this Agreement.

23.10.  *Governing Law.*  The Agreement will be deemed to have been executed and delivered in the State of Missouri and shall be governed by and construed under the laws of the State of Missouri without regard to conflicts of law rules, except that the UCC as in effect in the State in which the Premises is situated shall govern regarding all filings pursuant to Section 8.6 hereof. Each Party (a) consents to the jurisdiction of all courts of competent jurisdiction in the State of Missouri, (b) agrees that all litigation under or as a result of this Agreement shall be instituted in such a court, and (c) waives all objections to the venue of such a court.

SIGNATURE PAGE FOLLOWS

534605.01
REV 06-18-2015

IN WITNESS WHEREOF, the Parties have executed and have caused this Agreement duly to be executed and delivered as of the date first hereof written.

WAREHOUSEMAN:

DEPENDABLE COMPANIES, INC.

By: _____

Name: _____TOM LENITZ_____

Title: _DIR. WHSE SERVICES_

DEPOSITOR:

ANHEUSER-BUSCH, LLC

By: _____

Name: _FRANCISCO JIMENEZ_____

Title: _LOGISTICS SUPPORT MGR. PROCUREMENT_

and

By: _Elizabeth Cline_

Name: _Elizabeth Cline_

Title: _SR LOGISTICS ANALYST_

- 39 -

EXHIBIT A

**Equipment**

| **Handling Equipment:** | **No. Units** | **Cost/Unit** | **Total Cost** |
|---|---|---|---|
| NONE as of 1 Nov 2016 | | | |

**Cleaning Equipment:**

NONE as of 1 Nov 2016

**Total Annual Cost: $_____**

**Miscellaneous Equipment:**

NONE as of 1 Nov 2016

**Total Annual Cost: $_____**

574310

EXHIBIT B

Handling Fees

| Rate Type | Commodity | Unit Description | Handling Fee Per Unit into Premises Per Month |
|---|---|---|---|
| Per Pallet | In/Out Fee – Billed upon "in" to Warehouseman Facility – Single rate ($4.25 "in" + $4.25 out") | Movement & handling of pallets into and out of Warehouseman facility | $8.50/pallet |
| Per Pallet | Recurring Storage Fee | Fee for storage of pallets physically within facility location on 1st of month | $7.25/pallet |
| Per Pallet | Split Storage Fee (1st Half) | Fee for pallets received into facility from the 1st to the 15th. | $7.25/pallet |
| Per Pallet | Split Storage Fee (2nd Half) | Fee for pallets received into the facility from the 16th to the end of month. | $3.63/pallet |
| Per Shipment | BOL Fee | Fees for documentation preparation for outbound shipment from Warehouseman | $4.50/Shipment |
| As Needed | General Hourly Rate | Rates for ad-hock labor request by Depositor to Warehouseman | $35.00/hour |

Additional charges applied only as expressly agreed to in writing by Depositor. Any additional expenses greater than $1,000 per month will need to have supporting documentation provided in advance of billing.

Ancillary works, i.e., copack, inspection, other services will be presented in project form for separate quotation from Warehouseman to ensure alignment on costing of project.

Costs associated with drayage and transportation covered under separate agreement.

S34605.01
REV 06-18-2015

534605.01
REV 06-18-2015

## EXHIBIT C

**Operating Cost Report**

NOT USED

534605.01
REV 06-18-2015

## EXHIBIT D
## WAREHOUSE CONTAMINATION PREVENTION PROGRAM

In order to prevent contamination of Depositor products or packaging materials, the following will be required by Warehouseman:

1.    A Product Tampering Policy, such as the one described below, shall be implemented at the Warehouse and each employee shall acknowledge in writing his/her understanding and acceptance of the policy.

2.    Warehouseman shall implement pre-employment background checks (including criminal and driving record) and drug screen.

3.    The Warehouse should have adequate internal and external lighting and be equipped with appropriate access security measures designed to deter entry by unauthorized personnel.

4.    Warehouseman shall hold annual communications with employees to emphasize intolerance for tampering and intentional or unintentional contamination of materials or products.

5.    Warehouseman shall consider the development and deployment of a "Distribution Center Standard Operating Procedures Manual" to incorporate the above-listed items.

### PRODUCT TAMPERING POLICY

Our customers place the highest possible importance on the safety, quality and integrity of their products. The inclusion of any foreign material as well as damage done to any of our customers' products is a serious incident affecting the safety and integrity of our customers' products and our relationship with our customers. Tampering of any kind with our customers' products cannot be tolerated.

Many of our customers' products are regulated by the government and must comply with strict guidelines regarding safety, quality and integrity of the package ultimately provided to the end consumer. As such, there are significant consequences for all parties who engage in tampering with any of our customers' products. As a warehouse service provider, we must insure that no tampering with our customers' products or materials occurs while those items are within our custody or control. We will not tolerate the intentional or unintentional contamination of our customers' products.

Therefore, this document provides actual notice to you, the warehouse employee, that we have instituted this policy prohibiting any tampering with our customers' products or materials. All employees who handle products stored in our warehouse or under our control, must understand and comply with this policy, as well as any and all procedures developed to insure that no tampering or contamination occurs. Any warehouse employee found to be involved in a tampering incident, whether directly or indirectly, will be subject to serious disciplinary action, up to and including the termination of employment, possible criminal prosecution, and potential civil liability for any damages caused.

If any employee is aware or becomes aware of any tampering or contamination, whether intentional or unintentional, with any products or materials, he or she should immediately report that information to his or her

supervisor. If an employee is aware of tampering or contamination to our customers' product or materials and fails to "promptly" report knowledge of the tampering or contamination, that employee may also be subject to disciplinary action. Reporting "promptly" means prior to the time the product or material in question leaves our custody or control.

I affirm that I have read and understood this policy prohibiting tampering and contamination with our customers' products and materials and will comply with such policy.

_____                    11/3/16
Employee Name                                 Date

I

534605.01
REV 06-18-2015

Exhibit "C"

**First Amendment to Warehouse Services and License Agreement**
**(Dependable Companies Inc. 2555 E Olympic Blvd, Los Angeles, CA 90023)**

This First Amendment to Warehouse Services and License Agreement ("Amendment") is made as of the 8th day of July, 2019 by and between Dependable Companies,  Inc., a California corporation ("Warehouseman"), and Anheuser-Busch, LLC, a Missouri limited liability company with offices located at One Busch Place, St. Louis, MO 63118 ("AB").

WHEREAS, Warehouseman and AB entered into a Warehouse Services and Licensing Agreement dated July 1, 2016 ("Agreement") for the scope of services as defined in the Agreement;

WHEREAS, Warehouseman and AB desire to extend the term of the Agreement and to make certain modifications in connection with such extension.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged and in consideration of the terms and provisions set forth herein, the parties hereby agree as follows:

1. <u>Extended Term</u>. The Initial Term of the Agreement shall be extended for (1) one year, effective on July 1, 2019 and expiring on June 30, 2020 (the "Extended Term").  After the Extended Term, the Term shall automatically renew for one (1) successive Renewal Term of one (1) year, unless AB gives Notice to the contrary to Warehouseman at least ninety (90) days prior to the last day of the Extended Term and if such a notice is given, the Term shall end on the last day of the Extended Term which is June 30, 2020.

2. <u>Compensation</u>. Effective as of July 1, 2019 Exhibit B of the agreement shall be deleted in its entirety and replaced with the following Exhibit B attached hereto and incorporated into this Agreement:

3. <u>Defined Terms; Agreement Remains in Effect</u>. Capitalized terms used but not defined in this Amendment shall have the meaning assigned to them in the Agreement. Except as modified by this Amendment, the terms and conditions set forth in the Agreement shall remain in full force and effect. In the event of a conflict between the terms and conditions of this Amendment and the Agreement, this Amendment shall control.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date and year first written above.

ANHEUSER-BUSCH, LLC                                    **Dependable Companies Inc**

By: _Christopher Sheehan_                              By: _Thomas a Lentz_
    741ED069A5F74C8...

Name: _Christopher Sheehan_____                        Name:   Tom Lentz_____

Title: _Director, Procurement_                         Title: __VP of Warehouse Services

By: _Franco Jimenez_
    5769FAE96151482...

Name: _Franco Jimenez_____

Title: _Imp/Exp Operations Manager_

**EXHIBIT B**
**RATES**

| Term | DHE Proposal | DHE RATEs | UOM |
|---|---|---|---|
| Duration | 1 Year(July 1,2019-June 30 ,2020) | | |
| Option | ABI Option+1 Year (July 1, 2020-June 30, 2021) | Subject to Negotiable GRI | |
| Volume Allocation | US Import Cross-Docking, Warehousing & Dryage Services, LA | >85000 | pallets/yr |
| Whse Fee Structure | Finished Goods Pallet In and Out | $ 7.35 | Pallet |
| | Original Storage Incured upon Receipt 1st through 15th | $ 5.00 | Pallet |
| | Original Storage Incured upon Receipt 16thto EOM | $ 2.50 | Pallet |
| | Recurring Storage (1st of Month) | $ 6.00 | Pallet |
| | Bill of Lading Fee ( *includes bulkhead, blocking and bracing, and HIGH security seal*) | $ 0.78 | Pallet |
| | Insurance Admin Fee | $ 8,333.00 | Month |
| | Legal Liability Fee | $ - | |
| | Pallet (Standard 40 x 48 Grade B) | $ 8.00 | Pallet |
| | Stretchwrap (Material Only) | $ 26.45 | Box(4rolls) |
| | Standard Labor-Special Project/Damage Reclaim, disposal, blocking and unblocking, restacking | $ 35.00 | Hr |
| | Standard Labor-Special Project/Damage Reclaim, disposal, blocking and unblocking, restacking With Forklift | $ 50.00 | Hr |
| | Standard Labor- Supervisor/Special Project | $ 50.00 | Hr |
| | Incremental Overtime- Incremental to Standard labor rate when performing standard Finish Goods In and Out Services | .5 times | Standard Rate |
| | Overtime Full Rate - For Monthly Inventories and other work performed other than Standard Finish Goods  In and Out Services | 1.5 times | Standard Rate |
| Warehousue Operation Terms | *Unloading up 25 Inbound containers daily @ no extra charge as long as there are open available full locations within the agreed to footprint and the average weekly inbounds is greater than 90 per week for prior 4 weeks* | | |
| | *Adherence to the 'Inventory Count' Document - Agreed assuming the scale of FTEs needed increases  by 2 for every additional 1000 pallets and the process stays the same as it is currently-Monthy inventories billed at 1.5 times Standard labor rate* | | |
| | *Maintain at least a level DPO Qualified Status with continuous improvement at no charge to ABI* | | |
| Drayage Fee Structure | Drayage to DHE Crossdock (3 day working day chassis(M-Sat) and Overweight included) | $ 425.00 | Container |
| | Chassis rental after 3 days | $ 30.00 | Day |
| Proposed changes | *40 fixed full container spots on the lot* | | |
| | *$20.00 per day for loads in excess of 40 spots allocated* | | |
| | *Storage credit to be reviewed separately* | | |
| | *2 hrs free wait time,  after 2 hrs billed at $50 per hour* | | |
| Payment Terms | *Year 1 (effective payment terns actually 140 days at the 120 noted)* | 120 | Days |
| | *Year 2 (effective payment terns actually 140 days at the 120 noted)* | 120 | Days |

*DHE will return chassis 2 business days from time of unload.  AB will not be subject to additional days past those terms*

Exhibit "D"

**First Amendment to Warehouse Services and License Agreement**
**(Dependable Companies Inc. 2555 E Olympic Blvd, Los Angeles, CA 90023)**

This First Amendment to Warehouse Services and License Agreement ("Amendment") is made as of the 29th day of June, 2021 by and between Dependable Companies,  Inc., a California corporation ("Warehouseman"), and Anheuser-Busch, LLC, a Missouri limited liability company with offices located at One Busch Place, St. Louis, MO 63118 ("AB").

WHEREAS, Warehouseman and AB entered into a Warehouse Services and Licensing Agreement dated July 1, 2016 ("Agreement") for the scope of services as defined in the Agreement;

WHEREAS, Warehouseman and AB desire to extend the term of the Agreement and to make certain modifications in connection with such extension.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged and in consideration of the terms and provisions set forth herein, the parties hereby agree as follows:

1. Extended Term. The Initial Term of the Agreement shall be extended for (1) one year, effective on July 1, 2021 and expiring on June 30, 2022 (the "Extended Term").  After the Extended Term, the Term shall automatically renew for one (1) successive Renewal Term of one (1) year, unless AB gives Notice to the contrary to Warehouseman at least ninety (90) days prior to the last day of the Extended Term and if such a notice is given, the Term shall end on the last day of the Extended Term which is June 30, 2022.

2. Compensation. Effective as of July 1, 2021 Exhibit B of the agreement shall be deleted in its entirety and replaced with the following Exhibit B attached hereto and incorporated into this Agreement:

3. Defined Terms; Agreement Remains in Effect. Capitalized terms used but not defined in this Amendment shall have the meaning assigned to them in the Agreement. Except as modified by this Amendment, the terms and conditions set forth in the Agreement shall remain in full force and effect. In the event of a conflict between the terms and conditions of this Amendment and the Agreement, this Amendment shall control.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date and year first written above.

ANHEUSER-BUSCH, LLC                          **Dependable Companies Inc**

By: _Christina Cliburn_____          By: _____
     8A200598CA2E436...                            003A4ADCF1AA43C...

Name: _____          Name: Shaun Nakhost

Title: _____          Title: General Manager, Carson Campus

By: _Franco Jimenez_____
     5769FAE96151482...

Name: _____

Title: _____

**EXHIBIT B**
**RATES**

| Term | DHE Proposal | DHE Rates | UOM |
|---|---|---|---|
| Duration | 1 Year (July 1, 2021-June 30, 2022) | | |
| Volume Allocation | US Import Cross-Docking, Warehousing & Drayage Services, LA | >50,000 | Pallets/yr |
| Whse Fee Structure | Finished Goods Pallet In and Out | $ 10.00 | Pallet |
| | Original Storage incurred upon Receipt 1st thru 15th | $ 6.00 | Pallet |
| | Original Storage incurred upon Receipt 16th to EOM | $ 3.00 | Pallet |
| | Recurring Storage (1st of Month) | $ 10.00 | Pallet |
| | Bill of Lading Fee (includes bulkhead, blocking and bracing, and HIGH security Seal | $ 0.86 | Pallet |
| | Insurance Admin Fee | $ 8,333.00 | Month |
| | Legal Liability Fee | - | |
| | Pallet (Standard 40 x 48 Grade B) | $ 16.00 | Pallet |
| | Stretchwrap (Material Only) | $ 27.50 | Box (4 Rolls) |
| | Standard Labor- Special Project/Damage Reclaim, disposal, blocking and unblocking, restacking | $ 39.00 | Hour |
| | Standard Labor- Special Project/Damage Reclaim, disposal, blocking and unblocking, restacking with Forklift | $ 55.00 | Hour |
| | Standard Labor - Supervisor/ Special Project | $ 55.00 | Hour |
| | Incremental Overtime - Incremental to Standard Labor rate when performing standard Finished Goods In and Out Services | .5 times | Standard Rate |
| | Overtime Full Rate - For Monthly Inventories and other work performed other than Standard Finished Goods In and Out Services | 1.5 times | Standard Rate |
| Warehouse Operation Terms | Unloading up to 25 Inbound containers daily @ no extra charge as long as there are open available full locations within the agreed to footprint and the average weekly inbounds is greater than 90 per week for 4 weeks | | |
| | Adherance to the "Inventory Count Document" - Agreed assuming the scal of FTE's needed increases by 2 for every additional 1000 pallets and the process stays the same as it is currently - Monthly Inventories billed at 1.5 times the Standard Labor Rate | | |
| | Maintain Standard KPI tracking - No DPO commitment | | |
| Drayage Fee Structure | Drayage to DHE Crossdock (3 day working day chassis (M-Sat) and overweight included | $ 450.00 | Container |
| | Chassis rental after 3 days | $ 35.00 | Day |
| | 40 Fixed full container spots on the lot | | |
| | $20.00 per day for loads in excess of 40 spots allocated | | |
| | Storage credit to be reviewed separately | | |
| | 2 hrs free wait time, after 2 hours billed at $55 per hour | | |
| Payment Terms | | 120 | Days |

Exhibit "E"



Caroline A. Rutledge
Associate General Counsel
One Busch Place
St. Louis, Missouri 63118
Telephone: (314) 765-6692
Caroline.Rutledge @anheuser-busch.com

June 10, 2022

**VIA Mail**

Dependable Companies, Inc.
Attn: Shane VanDerWaag, Director
800 East 230th Street
Los Angeles, CA 900745

> **Re:** ***Formal Notice of Breach of TRANSPORT AGREEMENT FOR THE
> PROVISION OF TRUCKLOAD CONTRACT CARRIAGE between Anheuser-
> Busch, LLC and Dependable Companies, Inc. and Overcharge by Dependable
> Companies, Inc.***

Dear Mr. VanDerWaag:

This letter serves as a formal notice to Dependable Companies, Inc. (hereafter, "DHE")
of their breach of the Transportation Agreement for the Provision of Truckload Motor Contract
Carriage (hereafter, "TA") and as a result, Anheuser-Busch, LLC (hereafter, "A-B") formally
provides notice of overcharging by DHE. A-B challenges the accuracy and responsibility of
pending invoices due to lack of service by DHE. DHE entered into the TA with A-B to provide
specialty services for A-B on July 1, 2016 and entered into an amended Services and License
Agreement (hereafter, "SLA") on July 8, 2019.

A-B contracted with DHE to transport cargo from the Ports of Los Angeles and Long
Beach. DHE failed in their obligation to transport cargo without undue delay, causing A-B to
incur additional unnecessary charges. DHE directly caused A-B to lose their preferential right at
the Ports.

Section 2 of the TA states:

In recognition of Shipper's needs for specialized scheduling and uninterrupted
transportation service in which TIME IS OF THE ESSENCE, Carrier agrees to perform
the following specialized services:

(b) Transport all cargo without undue delay to delivery points designated by Shipper, and deliver such cargo at such points in the same condition as received.

DHE failed to comply with Section 2 of the TA.

A-B will not pay invoices that are a direct result of DHE lack of performance, to include invoice numbers B121244, C800062, C800068, C800112, C800095, M114924, M115538, M115545, M118078, M117510, C800154, M113776, M122777, M110378, M113616.

A-B contests the charges DHE caused due to demurrage, per diem, and chassis rental, amounting to $876,170.  A-B is open to conference on the invoices to clarify who is responsible for payment.

A-B is willing to meet and confer with DHE in an effort to negotiate the remaining demurrage, old invoices less than 180 days, and administrative fees amounting to a total of $972,918.50.

I look forward to your prompt response and thank you in advance for your cooperation.  If you would like to meet and discuss, I am generally available the afternoon of June 14, all day on June 16, and the morning of June 17.  I can provide additional dates if needed.  Nothing in the above letter is intended to waive any of A-B's rights, all of which are expressly reserved.

Sincerely,

Caroline A. Rutledge
Associate General Counsel